REGENCY HOMES ASSOCIATION, APPELLEE, V. GEORGE W. EGERMAYER, JR., AND JEAN M. EGERMAYER, APPELLANTS.

498 N.W.2d 783

Filed April 23, 1993.    No. S-90-710.

Michael J. Lehan, of Kelley & Lehan, P.C., for appellants.

William A. Day, Jr., and William J. Dunn, of Gross & Welch, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

FAHRNBRUCH, J.

After trial of this real estate foreclosure action, the district court for Douglas County held, inter alia, that a declaration requiring Regency subdivision homeowners to pay dues to Regency Homes Association (RHA) is a valid covenant running with the land.

The trial court entered judgment for $884 plus costs against the appellant homeowners, George W. Egermayer, Jr., and his wife, Jean M. Egermayer. RHA's foreclosure of its lien against the Egermayers' real estate for unpaid RHA dues and other charges was also upheld.

We affirm the judgment of the district court.

## ASSIGNMENT OF ERROR

The sole issue raised by the Egermayers on appeal is whether the trial court erred in finding the Declaration of March 19, 1968 (Declaration), to be a valid covenant running with the land as it applies to the obligation of a property owner to pay dues to a social club open to the public and owned by a private individual.

For reasons hereinafter discussed, we believe the Egermayers have mischaracterized the nature of the obligation imposed by the covenant. The issue may more accurately be described as whether the trial court erred in finding the Declaration to be a valid covenant running with the land as it applies to the obligation of a property owner to pay money to a homeowners' association that operates a recreational facility.

The Egermayers also assign as error the district court's failure to grant their motion for new trial. This assignment of error is not discussed in their brief. To be considered by the Supreme Court, an error must be assigned *and discussed* in the brief of one claiming that prejudicial error has occurred. *Carlson v. Zellaha*, 240 Neb. 432, 482 N.W.2d 281 (1992); *State v. Melton*, 239 Neb. 576, 477 N.W.2d 154 (1991); *In re Interest of B.M.*, 239 Neb. 292, 475 N.W.2d 909 (1991).

## STANDARD OF REVIEW

An action to foreclose a lien on real estate is grounded in equity. See, *County of Keith v. Fuller*, 234 Neb. 518, 452 N.W.2d 25 (1990); *Production Credit Assn. of the Midlands v.*

*Schmer*, 233 Neb. 749, 448 N.W.2d 123 (1989). In an appeal of an equity action, this court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, when credible evidence is in conflict on a material issue of fact, this court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## FACTS

The Regency subdivision, a large multiuse development with residential, commercial, and recreational areas, was developed in Omaha in the late 1960's by Regency, Inc., and United of Omaha. Regency, Inc., apparently was or is a wholly owned subsidiary of United of Omaha. The plaintiff, RHA, was incorporated in the State of Nebraska on March 15, 1968.

In the Declaration, Regency, Inc., set forth the general and specific covenants governing the subdivision, and five individuals described as "all of the owners other than Regency, Inc.," accepted and agreed to the Declaration. At issue in this lawsuit is § 4 of the Declaration, requiring property owners to be members of RHA. That section provides:

4. Association: The involved property is . . . included in membership in [RHA] subject to all and each of the following conditions and other terms:

a. [RHA] will have the right, in general, without any part of its net earnings inuring to the private benefit of its members, to promote and sustain their social welfare and otherwise provide for their health, pleasure, recreation, safety, and other nonprofitable interests by acquiring, maintaining, operating, contributing to the acquisition, maintenance, or operation of, or otherwise *making available for use any one or more area entrances or entry structures, boat docks, golf courses, lakes, parks, swimming pools, tennis courts, and any other recreational equipment*, facilities, grounds, or structures, by providing weed and other actual or potential nuisance abatement or control, security service, and other community services, by exercising architectural control and securing

compliance with or enforcement of applicable covenants, easements, restrictions, and similar limitations, *by fixing and collecting or abating dues or other charges for financing its operations*, by delegating by contract or otherwise to any other Nebraska nonprofit corporation general responsibility for administration and executive management of its affairs, and . . . to engage in any other venture for the mutual nonprofitable interests of its members for which a corporation may be organized under the Nebraska Nonprofit Corporation Act, as amended.

b. . . . [E]very lot will be automatically included in membership in [RHA] as a benefit or burden running with and charge upon the ownership of each such lot . . . .

c. Dues or other charges for each lot included in membership fixed by [RHA] in the manner set out in its Articles of Incorporation or its By-Laws, as from time to time amended, will each constitute until abated or paid a lien upon and charge against such lot in favor of [RHA] . . . .

(Emphasis supplied.)

Section 5 of the Declaration provides for enforcement of covenants, easements, and other terms of the Declaration through legal and equitable proceedings, and entitles RHA to "fix a reasonable charge for such action as a lien upon and charge against such lot in favor of [RHA]." The parties have stipulated that the Declaration was recorded at pages 103 through 116 of book 461 of the Miscellaneous Records of the Register of Deeds of Douglas County, Nebraska.

The recreational facilities for the Regency subdivision were developed by United of Omaha, the developer of the subdivision, in the late 1960's. A 25-acre lake was built first, followed by construction of a clubhouse in 1968-69. Other amenities included a private lakeshore park, tennis courts, and a swimming pool, all funded by United of Omaha for the benefit of Regency dwellers. The recreational facility has been known as Regency Lake and Tennis Club (RLTC). United of Omaha also owned and maintained a 1-acre park within the subdivision.

On May 31, 1980, United of Omaha deeded the 1-acre park

and the 4 acres on which RLTC is situated, including the clubhouse, tennis courts, and parking lot, to RHA. Although use of Regency Lake is available to RHA members, the lake itself continues to be privately owned and is now operated by Regency Lake Association. RHA contributes 35 percent of the operating costs of the lake, which costs are shared by two other entities.

The RHA bylaws create and define two classes of membership:

SECTION 2: MEMBERS

. . . .

b. Regular Members: Regular Members shall be as follows:

(1) Each individual contract purchaser or owner of a residential lot or a townhouse lot or dwelling unit within the limits of any real property included in membership, any one of each of several individual contract purchasers or owners of any one such lot or unit designated by them . . . and each corporate or other non-individual contract purchaser or owner of any such lot or unit shall be a Regular Member and have one such membership for such lot or unit.

. . . .

c. Special Members: Special Members shall be as follows:

(1) Any individual shall be eligible for membership as and shall become a Special Member upon the submission of any application of content and form directed by the Board of Directors and the acceptance and approval thereof by it, but so far as practicable the total number of Special Members shall not be more than the total number of residential lots and townhouse lots or dwelling units within the limits of all real property included in membership reduced by the total number of individual Regular Members.

From fiscal year 1978-79 through the 1988-89 fiscal year, the period of time reflected in the record, regular RHA members were required to pay dues of $225 per year to RHA. Special membership dues were $325 for fiscal year 1978-79 and had

increased to $600 annually by fiscal year 1988-89. Regular RHA members have also been required since the 1984-85 fiscal year to pay a special assessment, described as maintenance dues, of $100 per year to the RHA. These additional dues pay the city of Omaha for upgraded maintenance of common areas of the subdivision. The cost of such maintenance was supported by the taxing authority of a sanitary and improvement district prior to Regency's annexation by the city of Omaha in the early 1980's.

The Egermayers purchased their property in Regency as the last of several rapid real estate transactions. This may account for the later confusion by RHA as to who was responsible for payment of the regular membership fees on the Egermayer property. Regency, Inc., originally deeded Lot 10, Regency First Addition, by warranty deed to Almyra B. Gordon on April 23, 1971. On August 17, 1978, Jeanne M. Kautter purchased the property from Gordon's estate, and on October 9, 1978, Jeanne M. and William H. Kautter conveyed the property to Patricia M. Fitl by warranty deed. Finally, on December 11, 1978, James G. and Patricia M. Fitl conveyed Lot 10 to George W. and Jean M. Egermayer as joint tenants.

The record shows that the Fitls applied to become special members of RHA on June 14, 1978, prior to the time Patricia Fitl bought Lot 10. The accounts receivable ledger for the Fitls' account indicates a payment of $325 on June 21, 1978, for 1978-79 dues, and another payment of $360 on April 11, 1979, for 1979-80 dues. This amount was credited back to the Fitls on April 26, 1979, with the notation "cr. spec. dues," and was rebilled as regular dues of $225 that same date, even though Lot 10 had been conveyed to the Egermayers over 4 months previously. James Fitl testified in his deposition that the Fitls owned no other property in Regency at that time.

The Fitls continued to pay dues to RHA as regular members through 1986. However, RHA's 1987-88 dues statement to the Fitls was returned unpaid and marked "please cancell [sic]." The RHA manager testified she immediately called James Fitl, who informed her that the property had been sold to the Egermayers 6 years previously. She further testified that the RHA had not been notified of this sale.

On May 19, 1987, the RHA manager billed George Egermayer for the 1987-88 dues and assessments. The Egermayers have refused to pay the assessment for regular membership in RHA. They assert that they are willing to pay the $100 annual assessment for maintenance, but the record reflects that the Egermayers have never made payments of any type to RHA.

On September 1, 1988, RHA sued the Egermayers to foreclose its lien on the Egermayer property for dues and other charges, plus interest.

George Egermayer testified at trial that he was unaware of any requirement to pay dues to RHA from the time he purchased the lot until RHA billed the Egermayers for membership in 1987. However, he agreed at trial that he had purchased the property subject to easements, reservations, restrictions, and protective covenants of record, as noted on the deed to the property.

The district court found that "[t]he declaration of record requiring owners of the residential lots in question to be members of [RHA] and to pay dues and assessments is a valid covenant running with the land and is binding on [the Egermayers]." The court further found that RHA was entitled to foreclose its lien in the amount of $884 and costs. The Egermayers timely appealed to this court.

## NATURE OF REGENCY HOMES ASSOCIATION AND REGENCY LAKE AND TENNIS CLUB

As a preliminary matter, it is necessary to determine to what type of entity the Egermayers, as Regency property owners, are required by the Declaration to pay dues. As previously noted, the Egermayers have characterized the issue in this case as whether the Declaration is a "valid covenant running with the land as it applies to the obligation to join and pay dues to *a social club open to the public* and *owned by a private individual.*" (Emphasis supplied.)

First, we consider the Egermayers' contention that the Declaration requires them to pay dues to a social club. The Declaration requires that Regency property owners pay dues to the RHA; there is no requirement that dues be paid to RLTC. In

fact, the Declaration makes no mention of RLTC. However, the Egermayers argue that RHA and RLTC are the same entity. The manager of RHA, Hildegard Herzfeldt, seemed to concede this point at trial when she testified as follows: "[Appellants' attorney:] The Regency Lake and Tennis Club, is that a name for the same entity as the Regency Home Association, or is that a separate entity? [Herzfeldt:] That's right. It's the same. Q. It's the same? A. Yes." In addition, in interrogatories RHA identified both the members of RHA and the members of RLTC by referring to an attached copy of the 1988-89 RLTC directory.

However, other evidence in the record indicates that RHA and RLTC are not in fact identical entities. A former president of RHA, John Hubbard, testified that RHA is the "formal body of members" and that RLTC has no separate existence from RHA as a subsidiary corporation, a sole proprietorship, or partnership. Hubbard further testified that RLTC is "just a facility or a club or an activity that is operated by [RHA] as a corporation."

While RLTC may have no separate existence apart from RHA, it is quite apparent that RHA does have an existence apart from RLTC. For example, RHA maintains a 1-acre park and an entrance to the residential area which are not maintained by the city of Omaha, provides architectural review for the subdivision, and provided security patrol for the subdivision until after Regency was annexed by the city. Although RHA also operates and maintains the RLTC, we conclude upon a de novo review that this is not RHA's sole function, and the Egermayers cannot complain that they are being assessed dues merely for a social club.

Next, we turn to the assertion that RLTC is a nonexclusive club which is open to the public. The word "public" may be defined as "the community at large . . . . [It] does not mean all the people . . . but so many of them as contradistinguishes them from a few." Black's Laws Dictionary 1227 (6th ed. 1990). On the other hand,

> [m]embership in a club arises out of the application of
> the member, its acceptance by the club, and the provisions
> of the by-laws. A private club has the right to select its own

members, and membership in such context is not a constitutional right, but rather is a bare privilege . . . .

14A C.J.S. *Clubs* § 10 at 614-15 (1991).

The terms of the RHA bylaws; the fact that membership is available only to Regency property owners and a limited number of other individuals who must apply for membership, must be recommended by two members, and must be approved by the board of directors; and the fact that the RLTC is not open to the general public are all indicia of a private club.

Finally, we turn to whether RLTC is a "privately owned" facility. The Egermayers state that at the time they bought their lot, "both the lake and the social club were privately owned. Today, the lake continues to be privately owned." Brief for appellants at 20.

The record indicates that all of the facilities of RLTC with the exception of the lake were deeded to RHA by United of Omaha, the developer of Regency, on May 31, 1980. This was almost a year and a half after the Egermayers bought Lot 10. Since that time, members of RHA have had a common ownership of the club facilities. The fact that United of Omaha retained ownership of RLTC for approximately 12 years is not dispositive of whether RLTC is "privately owned." See *Boyle v. Lake Forest Property Owners Ass'n*, 538 F. Supp. 765 (S.D. Ala. 1982) (holding that a developer, carrying out a uniform plan of development for a residential subdivision, may arrange for provision of certain services to the subdivision and for the maintenance of the facilities devoted to common use, and may bind the lot purchasers in the subdivision to pay for those items.)

Nor does the fact that Regency Lake is privately owned impute private ownership to RLTC. Although RHA pays a portion of the maintenance for the lake, RHA members are allowed access to the facility. Under the circumstances, it cannot be said that the Egermayers are being required to pay dues to a privately owned club.

Upon a de novo review of the record, we conclude that the Egermayers are not being required by the Declaration to pay dues to a public social club which is privately owned, but to a homeowners' association. We thus turn to the underlying issue

in the case, that is, whether the Declaration is a valid covenant running with the land as it applies to the obligation of a property owner to pay dues to a homeowners' association which operates a recreational facility.

## VALIDITY OF THE COVENANT

The precise question of whether a property owner is bound by a covenant to pay dues to a homeowners' association for the maintenance of recreational facilities is one of first impression in Nebraska. Other jurisdictions have considered the issue, and we turn to those cases for guidance.

The nature of the covenant to pay dues to the RHA, that is, whether the covenant runs with the land, is central to the determination of the issue before the court. "A covenant is either real or personal. Covenants that run with the land are real as distinguished from personal covenants that do not run with the land." *Raintree Corp. v. Rowe*, 38 N.C. App. 664, 669, 248 S.E.2d 904, 907 (1978). A personal covenant is not assignable. See, e.g., *Whitney v. Combe*, 151 Neb. 401, 37 N.W.2d 613 (1949); *Raintree Corp. v. Rowe, supra*. If the covenant at issue is personal, it is not binding on the Egermayers; if the covenant is real, it runs with the land, and the Egermayers are bound by the terms of the Declaration.

The general rules governing the running of covenants are rooted in the English common law. It was *Spencer's Case*, 5 Co. Rep. 16 a, 77 Eng. Rep. 72 (1583), which first stated that for a covenant to run with the land it must "touch or concern" the land, and it must expressly bind assigns. As the law of covenants evolved, the English courts distinguished between negative covenants, which bind the covenantor not to perform an act, and affirmative covenants, which require the covenantor to perform an act. See 5 Richard R. Powell, The Law of Real Property ¶ 675[1] (1993). The English courts looked with disfavor on covenants requiring affirmative action, and ultimately adopted the rule that affirmative covenants may not run with the land either at law or in equity. *Id*. at ¶¶ 670[2] and 675[1].

Generally, in the United States the three essential requirements for a covenant of any type to run with land are (1)

the grantor and the grantee intend that the covenant run with the land, as determined from the instruments of record; (2) the covenant must "touch and concern" the land with which it runs; and (3) the party claiming the benefit of the covenant and the party who bears the burden of the covenant must be in privity of estate. See, e.g., *Neponsit P. O. Ass'n v. Emigrant I. Sav. Bank*, 278 N.Y. 248, 15 N.E.2d 793 (1938); *Homeowners Assoc. v. Sellers and Homeowners Assoc. v. Simpson*, 62 N.C. App. 205, 302 S.E.2d 848 (1983), *cert. denied* 309 N.C. 461, 307 S.E.2d 364; *Lake Arrowhead Club v. Looney*, 112 Wash. 2d 288, 770 P.2d 1046 (1989); *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 457 N.E.2d 1226 (1983).

The Egermayers do not dispute that the first and third of these requirements are met. Moreover, the recorded instruments in the record support that the grantor, Regency, Inc., and the five original grantees intended the covenants contained in the Declaration to run with the land and that the Egermayers and RHA are in privity of estate. Rather, the Egermayers argue that the covenant in question does not "touch and concern" the land. Therefore, we limit our analysis to that issue.

The "touch and concern" requirement of a real covenant is one with which many jurisdictions have struggled. The New York Court of Appeals has held that

> a covenant which runs with the land must affect the legal relations—the advantages and the burdens—of the parties to the covenant, as owners of particular parcels of land and not merely as members of the community in general, such as taxpayers or owners of other land. [Citations omitted.] That method of approach has the merit of realism. The test is based on the effect of the covenant rather than on technical distinctions. Does the covenant impose, on the one hand, a burden upon an interest in land, which on the other hand increases the value of a different interest in the same or related land?

*Neponsit P. O. Ass'n v. Emigrant I. Sav. Bank*, 278 N.Y. at 257-58, 15 N.E.2d at 796. In that case, the court held that purchasers of individual lots in a residential community also obtained the right of enjoyment of the roads, streets, beaches,

and other improvements, and thus were liable for paying the costs of such improvements as required by covenant. The court further held that the property owners' association was entitled to enforce the covenant by foreclosure of its lien against the property owner.

In *Chesapeake Ranch Club v. CRC Members*, 60 Md. App. 609, 483 A.2d 1334 (1984), the Maryland Court of Special Appeals held that a covenant to pay an annual road charge was one which touched and concerned the land, but held that a covenant requiring property owners to pay dues to a recreational and social club did not run with the land. The Maryland court stated that the test of whether a covenant runs with the land is " 'whether it tends directly or necessarily to enhance [the land's] value or render it more beneficial or convenient to those by whom it is owned or occupied,' " *id*. at 616, 483 A.2d at 1337, and found that the amenities of the club merely benefited the community as a whole and did not increase the value of individual lots.

The Oregon Court of Appeals has held that severability of club membership from property ownership defeated the "touch and concern" requirement because property owners had no commonality of interest in the club property. *Ebbe v. Senior Estates Golf and Country Club*, 61 Or. App. 398, 657 P.2d 696 (1983). In that case, the court held that payment of an initiation fee for membership in a golf club did not "touch and concern" the land when membership was mandatory for initial purchasers, but membership was neither mandatory nor guaranteed for subsequent purchasers.

The U.S. District Court for the Southern District of Alabama, applying Alabama law, found that covenants meet the "touch and concern" requirement when "the provisions thereof enhance the value of the various individual lots in the . . . [s]ubdivision, constitute a part of a common plan or scheme of development of the subject subdivision and grant rights of use of the common facilities to the Grantees." *Boyle v. Lake Forest Property Owners Ass'n*, 538 F. Supp. 765, 768-69 (S.D. Ala. 1982). The court held that a covenant which required payment of dues to a homeowners' association to enable the association to acquire recreational facilities and other common

areas from the developer of the subdivision was one which touches and concerns the land, and thus was an affirmative covenant running with the land. The club was open to all homeowners in the subdivision and to members of similar clubs established by the developer in other parts of the country. The court concluded that mandatory membership in the Lake Forest Yacht and Country Club enhanced the value of the individual lots in the subdivision.

Similarly, the Illinois Supreme Court found that a covenant requiring condominium owners to pay dues to a for-profit sports club developed by the condominium developer touched and concerned the land because the facility was adjacent to the condominium units, was used by residents of the condominiums, and was part of a common building plan. *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 457 N.E.2d 1226 (1983).

California's "touch and concern" requirement is determined by statute. "Section 1468 of the Civil Code embodies the common law requirements [that a burden touch and concern the land] by specifically stating that a covenant running with the land must relate '. . . to the use, repair, maintenance or improvement of . . . such land or some part thereof . . . .' " *Anthony v. Brea Glenbrook Club*, 58 Cal. App. 3d 506, 510, 130 Cal. Rptr. 32, 34 (1976). In that case, a covenant required membership in a homeowners' association which operated a clubhouse, swimming pool, and recreation area located within the subdivision. All members of the club were homeowners in the subdivision, and all fees paid to the homeowners' association were used for maintenance and support of the club. The court held that mandatory membership in the homeowners' association was a valid and enforceable covenant running with the land.

The North Carolina Court of Appeals has held that "[t]o touch and concern the land the object of the covenant must be annexed to, inherent in, or connected with, the land." *Homeowners Assoc. v. Sellers and Homeowners Assoc. v. Simpson*, 62 N.C. App. 205, 210, 302 S.E.2d 848, 852 (1983), *cert. denied* 309 N.C. 461, 307 S.E.2d 364. The court found that a covenant to pay fees to a homeowners' association for

maintenance of recreational facilities touched and concerned the land. The recreational facility was within the subdivision, and the court found it irrelevant that the facility was not adjacent to each individual lot.

All of these tests for whether a covenant touches and concerns the land are helpful, but none provides such a clear-cut rule as to be dispositive of the present case. Indeed, the New York Court of Appeals has aptly concluded that " '[i]t has been found impossible to state any absolute tests to determine what covenants touch and concern land and what do not. The question is one for the court to determine in the exercise of its best judgment upon the facts of each case.' " *Neponsit P. O. Ass'n v. Emigrant I. Sav. Bank*, 278 N.Y. 248, 256, 15 N.E.2d 793, 795 (1938).

Nonetheless, for the purpose of analysis, we adopt the New York Court of Appeals' rule that the touch and concern requirement of a real covenant is met when the covenant affects the legal relations—the advantages and the burdens—of the parties to the covenant, as owners of particular parcels of land and not merely as members of the community in general, such as taxpayers or owners of other land. The covenant must impose, on the one hand, a burden upon an interest in land, which on the other hand increases the value of a different interest in the same or related land.

Based upon the holdings of jurisdictions which have considered issues similar to the one before us, we believe the following factors are to be considered in determining whether a covenant to pay dues to a recreational facility touches and concerns the land: (1) whether the recreational facility and the residential area are part of a common scheme of development, (2) whether the recreational facility is in close proximity to the residential area, and (3) whether the covenant grants the right of common use of the recreational facility to all property owners.

Applying the above factors to this case, we must first determine whether the residential area and the recreational areas of Regency were part of a common scheme of development. John Maenner, president of Maenner Company, the sales agent for all the property within Regency, was involved with the initial planning for the subdivision. Maenner testified

that Regency was by far the largest of the more than 35 subdivisions he had helped develop in Omaha and that there was considerable planning and thought given to the special amenities for the area. Such amenities included the lake, the club, and related facilities.

Louis R. Seybold, now retired from the Maenner Company, was also involved in the development of Regency, and testified that the subdivision was a planned community which was to have multiple uses, including an office park, apartments, townhomes, single-family homes, and sporting amenities. The sporting amenities included a 25-acre lake, a private lakeshore park, a 1-acre park in the residential area, and 4 acres of land upon which RLTC was ultimately built. Seybold testified that he had been involved in 10 to 12 other residential developments in the Omaha area and that Regency was far larger and more elaborate than any of the other developments. Such testimony by Maenner and Seybold leaves no doubt that the residential and recreational areas of Regency are part of a common scheme of development.

Next, we must determine whether the RLTC is in close proximity to the residential area of Regency. The RLTC, while located in the Regency development, is located across a four-lane road from the residential area. The Egermayers complain of the fact that the RLTC is not centrally located within the residential area and is instead located next to a commercial area. The evidence reflects that while the RLTC is not in the single-family residential area of Regency, it is bordered on one side by the Regency Apartments, and it is also bordered by Regency Lake.

Moreover, while the Egermayers perceive the location of the RLTC to be a negative, it is entirely conceivable that some property owners might perceive the location favorably. There are valid reasons why a property owner might not want to live in very close proximity to a recreational facility. The increase in noise, litter, and traffic often occasioned by such a facility are some reasons which come immediately to mind. Because the RLTC is located within the Regency development, even though it is across a four-lane street from the single-family residential area, we find that the RLTC is in close proximity to that

residential area.

As to the third factor, the language of the covenant leaves no doubt that all Regency property owners have a right of common use of the RLTC. The introductory paragraph of § 4 of the Declaration states that "[t]he involved property . . . will be . . . included in membership in [RHA] . . . ." Section 4b states that "every lot will be automatically included in membership in [RHA] . . . ."

The Egermayers do not deny that as Regency property owners, they have a right of common use of the RLTC. Instead, their position is that because Regency property owners are not the *exclusive* users of RLTC, the covenant requiring payment of dues to RHA does not touch and concern the land. The Egermayers assert that the existence of a special membership class for those who live outside the Regency subdivision makes RLTC a public facility which has no particular value to property owners in Regency.

This argument fails for two reasons. First, as previously noted, RLTC cannot be characterized as a public facility. Second, even though special members are allowed to join RHA and use the RLTC facility, the Regency property owners still have a common property right with one another. All Regency property owners are required to pay dues to RHA for membership in RLTC, and all have a common right to use of the facilities. The existence of a special membership class is not dispositive. See *Boyle v. Lake Forest Property Owners Ass'n*, 538 F. Supp. 765 (S.D. Ala. 1982) (holding that requirement to pay dues for maintenance of club, which was used by property owners in subdivision as well as members of other clubs owned by same developer, was a valid covenant running with the land). Cf. *Ebbe v. Senior Estates Golf and Country Club*, 61 Or. App. 398, 657 P.2d 696 (1983) (holding that club membership had been severed from property ownership when subsequent purchasers were neither required to join nor were they guaranteed membership in golf club, and mandatory "initiation fee" could not be assessed as a lien against the property of such a purchaser).

This brings us to the ultimate question of whether RLTC enhances the value of individual properties in the Regency

subdivision. George Egermayer testified that in his opinion, RLTC adds no value whatsoever to his property because the facility is located across four lanes of traffic from the residential area, it is not centrally located, it is next to a commercial area, and it is open to the public. Another homeowner in the Regency subdivision testified that in his opinion, mandatory membership in the RHA definitely enhanced the property values in the area and that property values would be adversely affected if membership in RHA were to be voluntary rather than mandatory. Two of the original developers of the Regency subdivision, neither of whom lives in Regency, also testified that the absence of mandatory dues to RHA would be detrimental to property owners and that property values would be lowered.

Whether membership in RHA benefits individual Regency homeowners is a material issue of fact in determining whether the covenant requiring membership touches and concerns the land. The only evidence that membership in RHA does not benefit individual property owners was offered by the party seeking to avoid payment of the mandatory dues. After considering all the testimony on this issue, we agree with the California Court of Appeals that "the maintenance of a well-kept clubhouse, recreational area and swimming pool . . . enhance[s] the value of each home therein. . . . [T]he so-called 'burden' of maintaining membership in this association would in reality be an asset to each and every property owner in the use of his land." *Anthony v. Brea Glenbrook Club*, 58 Cal. App. 3d 506, 511, 130 Cal. Rptr. 32, 34 (1976).

Apart from the social amenities offered by RLTC, we find that membership in RHA provides numerous other benefits to property owners. There was testimony that RHA dues pay for maintenance of a 1-acre park within the subdivision, as well as the green areas at the 96th Street entrance to the subdivision. George Egermayer concedes that maintenance of the common areas of the subdivisions, parks, drives, and trees adds value to his property. We can only conclude that maintenance of the green areas owned by RHA and paid for through part of the annual $225 assessment contributes some of this added value.

Dues also paid for the services of a private security patrol for

the residential neighborhood until sometime after the subdivision was annexed by the city of Omaha. Financial statements entered into evidence reflect that as much as $17,128 per year was spent for security patrol through the fiscal year ending May 31, 1985. Private security service is an asset which enhances the value of individual properties.

The bylaws of RHA provide for an architectural control committee and authorize the expenditure of funds by that committee. The architectural review committee reviews and approves all new construction, as well as additions or modifications to existing structures, to ensure that the external designs of all buildings and structures are in harmony with the "surroundings, topography, and other relevant architectural factors of concern." A former president of RHA testified that while he was president the committee met from time to time and incurred certain expenses, including payments to experts to advise the committee. Again, this is a function of RHA which benefits all property owners in Regency by protecting against unsightly or inappropriate building in the subdivision.

## CONCLUSION

Upon a de novo review of the record, we conclude that the covenant requiring membership in the RHA enhances the value of individual properties in the Regency subdivision so as to meet the "touch and concern" requirement of a real covenant running with the land. RHA is entitled to foreclose its lien upon the Egermayer property to enforce payment of the RHA dues and other charges required by the covenant.

There being no cross-appeal, the judgment of the district court in its entirety is affirmed.

AFFIRMED.