[No. 54876-5.   En Banc.   April 13, 1989.]

LAKE ARROWHEAD COMMUNITY CLUB, INC., *Petitioner*, v. WILLIAM LOONEY, ET AL, *Respondents*.

*Herbert H. Fuller* and *Marya Carol Fuller* (of *Fuller & Fuller*), for petitioner.

*Nielsen, Nielsen & Leach* and *Drew Nielsen,* for respondents.

*Donna R. Roper* and *Eileen S. Peterson* on behalf of Washington Association of Realtors; *Philip A. Serka* on behalf of Washington Chapter of Community Associations Institute and Sudden Valley Community Association; *John G. Bauer* on behalf of Cherokee Bay Community Club, amici curiae for petitioner.

DURHAM, J.—A purchaser at a tax foreclosure sale generally acquires title that is clear of all prior encumbrances. As an exception to this rule, RCW 84.64.460 protects recorded appurtenant easements from extinguishment. In *Olympia v. Palzer*, 107 Wn.2d 225, 728 P.2d 135 (1986), we first addressed the effect of RCW 84.64.460 on covenants. We held that a restrictive covenant requiring the owner to maintain his property as a greenbelt for a planned unit development was akin to a negative easement and, therefore, survived the tax foreclosure sale. We hold in the present case that a covenant requiring the owner to pay his share of the costs of maintaining the neighborhood's facilities also survives a tax sale.

## FACTS

In 1966, the original developers of the Lake Arrowhead housing subdivision executed and recorded with the Mason County Auditor a document entitled "Lake Arrowhead Restrictive Covenants Running With Land". Covenant 21 authorizes the Lake Arrowhead Community Club, Inc. (Club), a nonprofit corporation, to charge and assess its members for the operation and maintenance of certain facilities[1] that are provided for the members' use. The Club subsequently enacted bylaws that provide for the imposition of liens if the assessments are not paid. The bylaws are not recorded.

On February 20, 1978, William Looney and his wife purchased property within the Lake Arrowhead development

---

[1]These include roads, a community beach and pavilion, and any additional facilities that are built with the membership's authorization.

at a tax foreclosure sale. Looney failed to pay the assessments that accrued after the date of his purchase. The Club filed liens against his property but the debt remained unpaid.

The Club filed suit in Mason County Superior Court. In July 1986, the trial court granted summary judgment to the Club, set damages in the amount of $492.58, granted $831 in attorney fees, and authorized the Club to foreclose on its liens if the judgment was not paid within 5 days. The Court of Appeals reversed, holding that the covenant to pay assessments was extinguished by the tax foreclosure sale. *Lake Arrowhead Comm'ty Club, Inc. v. Looney*, 50 Wn. App. 238, 748 P.2d 649 (1988).

BACKGROUND

The general rule in Washington is that a purchaser at a tax foreclosure sale takes title to the property free and clear of all previously existing encumbrances. See discussion in *Palzer*, at 228. In 1959, however, the Legislature passed a statute establishing an exception to the general rule. The statute provides that easements survive a tax foreclosure sale, as long as they are appurtenant in nature and they are recorded prior to the date of the delinquent taxes:

> The general property tax assessed on any tract, lot, or parcel of real property includes all easements appurtenant thereto, provided said easements are a matter of public record in the auditor's office of the county in which said real property is situated. *Any foreclosure of delinquent taxes on any tract, lot or parcel of real property subject to such easement or easements, and any tax deed issued pursuant thereto shall be subject to such easement or easements,* provided such easement or easements were established of record prior to the year for which the tax was foreclosed.

(Italics ours.) RCW 84.64.460.

In *Palzer*, this court was asked to decide if a restrictive covenant, requiring certain tracts to be maintained as greenbelts for a planned unit development for the general beautification of the entire development, qualified as an

"easement" for purposes of RCW 84.64.460. In analyzing this question, the court first noted that restrictive covenants dealing with the use of land or the character or location of buildings historically had been described as negative easements. The court defined a negative easement as "one which curtails the owner of the servient tenement in the exercise of some of his rights in respect of his estate in favor of the owner of the dominant tenement or tenements." (Italics omitted.) *Palzer,* at 230 (quoting Annot., *Easement or Servitude or Restrictive Covenant as Affected by Sale for Taxes,* 168 A.L.R. 529, 536 (1947)). We concluded that "restrictive covenants are the same as negative easements because they curtail the rights of the owner of the servient tenement in favor of the owners of all of the dominant tenements." *Palzer,* at 230.

We also indicated that the objectives of a planned unit development would be served if restrictive covenants were to survive tax foreclosure sales:

> The ability of homeowners in a PUD to enforce restrictive covenants against original and subsequent property owners helps ensure that the community will be able to maintain its planned character and provide the lifestyle sought by its residents in making their homes there.
>
> The restrictive covenants which apply use restrictions on property located in Evergreen Park are meant to benefit all of the homeowners who live there. . . . If these restrictive covenants were extinguished by the tax foreclosure sale, the planned character of Evergreen Park, the expectations of homeowners and statutory authority would be defeated.

(Citation omitted.) *Palzer,* at 230–31.

Finally, this court noted that other jurisdictions also have held that restrictive covenants are easements and are not extinguished by a tax foreclosure sale. *Palzer,* at 231 (citing cases from eight jurisdictions). Based on the foregoing analysis, the court determined that the greenbelt covenant survived the tax foreclosure sale.

Not surprisingly, the parties draw differing conclusions as to the proper application of *Palzer* to this case. The Club

argues that *Palzer* establishes the rule that all restrictive covenants—a term the Club interprets to include the present covenant—survive a tax foreclosure sale. Looney contends that *Palzer* should be interpreted to extinguish only those covenants that can be likened to negative easements. Looney argues that two factors prevent his covenant from being likened to a negative easement: first, a covenant to pay money is an affirmative obligation, and second, it does not directly restrict the use of land.[2]

## ANALYSIS

We deal first with Looney's proposed distinction between affirmative and negative covenants. A covenant to contribute one's share of the neighborhood's maintenance expenses generally is characterized as an affirmative covenant. *See* 5 R. Powell, *Real Property* ¶ 675[2][a] (1988); 6 P. Rohan, *Home Owner Associations and Planned Unit Developments Law and Practice* § 8.03[2] (1988). For the reasons discussed below, however, we conclude that the covenant in question falls within the scope of RCW 84.64.460.

It is important to note that the language of RCW 84.64.460 is not limited to negative easements, but includes also affirmative easements. Just as a negative covenant can be classified as a negative easement for purposes of RCW 84.64.460 under *Palzer,* so too an affirmative covenant can be likened to an affirmative easement.

Any other conclusion would be inconsistent with the tendency in American courts to forgo distinctions between the running of affirmative and negative covenants. *See* Browder, *Running Covenants and Public Policy,* 77 Mich. L. Rev. 12, 24 (1978), *cited in* 5 R. Powell ¶ 675[1] n.6; 6 P. Rohan § 8.03[2][c]. Although historically, American courts

---

[2]Looney raised an additional contention at oral argument that merits attention. The Club's bylaws, establishing the right to impose a lien for unpaid assessments and to foreclose on that lien, were not recorded. Consequently, Looney argues that the Club has failed to prove the requirement in RCW 84.64.460 that the easement be recorded. We disagree. The issue in this case is whether the covenant to pay maintenance expenses qualifies as an easement under the statute, and the covenant itself was recorded.

were disinclined to allow the running of affirmative covenants, the modern trend is to allow them to run in the same manner as negative covenants. This change of attitude represents an acknowledgment of the social usefulness of affirmative, as well as negative, covenants. 6 P. Rohan § 8.03[2]. Indeed, this court long ago allowed the running of an affirmative covenant as if it were a negative covenant. *See Rodruck v. Sand Point Maintenance Comm'n*, 48 Wn.2d 565, 295 P.2d 714 (1956).

In *Palzer* we stated that a negative easement is one which "curtails the owner of the servient tenement in the exercise of some of his rights in respect of his estate in favor of the owner of the dominant tenement or tenements." (Italics omitted.) *Palzer*, at 230 (quoting Annot., *Easement or Servitude or Restrictive Covenant as Affected by Sale for Taxes*, 168 A.L.R. 529, 536 (1947)). Along these same lines, the covenant in question qualifies as an *affirmative* easement, at least for purposes of RCW 84.64.460, because it creates additional obligations in respect of the estate of the owner of the servient tenement in favor of the owner of the dominant tenement or tenements.

We next turn to Looney's contention that a covenant must concern the use of land in order to qualify as an easement under the statute. There can be little doubt that easements involve the use of land. *See* Black's Law Dictionary 457 (5th ed. 1979). Moreover, the statute protects only *appurtenant* easements from extinguishment. Appurtenant easements are those that primarily benefit another piece of land rather than a particular individual. *Winsten v. Prichard*, 23 Wn. App. 428, 430, 597 P.2d 415 (1979). The analog for covenants are those that run with the land, because such covenants also involve obligations that are intended to benefit property rather than an individual. See below. Therefore, a covenant does not meet the requirements of RCW 84.64.460 unless it is so connected to real estate that it runs with the land.

For a covenant to run with the land, a number of conditions must be met:

(1) the covenants must have been enforceable between the original parties, such enforceability being a question of contract law except insofar as the covenant must satisfy the statute of frauds; (2) the covenant must "touch and concern" both the land to be benefitted and the land to be burdened; (3) the covenanting parties must have intended to bind their successors in interest; (4) there must be vertical privity of estate, *i.e.*, privity between the original parties to the covenant and the present disputants; and (5) there must be horizontal privity of estate, or privity between the original parties. W. Stoebuck, [*Running Covenants: An Analytical Primer,* 52 Wash. L. Rev. 861 (1977)].

(Footnotes omitted.) *Leighton v. Leonard,* 22 Wn. App. 136, 139, 589 P.2d 279 (1978), *quoted in Feider v. Feider,* 40 Wn. App. 589, 593, 699 P.2d 801 (1985).

■ For covenants to pay money, the critical issue is the "touch and concern" requirement. 5 R. Powell ¶ 675[2][a]. Under Washington law, an obligation to pay assessments for the maintenance of neighborhood property touches and concerns the land. *See Rodruck v. Sand Point Maintenance Comm'n, supra; Mullendore Theatres, Inc. v. Growth Realty Investors Co.,* 39 Wn. App. 64, 691 P.2d 970 (1984). The majority of American jurisdictions are in accord. 5 R. Powell ¶ 675[2]; 6 P. Rohan § 8.03[2][c]; Stoebuck, *Running Covenants: An Analytical Primer,* 52 Wash. L. Rev. 861, 870 (1977). Accordingly, Looney's covenant satisfies the "touch and concern" requirement.

■ Horizontal privity also is present in this case. Courts have held generally that this standard is met when one of the original contracting parties was a homeowners' association, even if the association did not have legal title in land at that time. 5 R. Powell ¶ 675[2][a]. According to these authorities, even if horizontal privity was lacking in form, "it was present in substance since the association was acting as the agent of all of the property owners." 5 R. Powell ¶ 675[2][a]. We find this reasoning persuasive.

Additionally, there can be little doubt that the parties intended the covenant to bind their successors in interest.

Covenant 15 provides that "[t]hese covenants are to run with the land and shall be binding on all parties and all persons claiming under them" for a specified number of years in the future.

We cannot determine from the record before us the requirements concerning vertical privity and the covenant's original enforceability. Accordingly, we remand these issues to the trial court for resolution. If these requirements are met, RCW 84.64.460 will protect the covenant from extinguishment,[3] leaving Looney liable for the assessments.[4]

Looney states that our holding would have a number of unfortunate consequences. He argues that allowing an assessment covenant to survive a tax foreclosure sale would unduly burden counties, who in many instances are the

---

[3]We note that this result runs counter to the position tentatively suggested by the *Restatement of Property*. The *Restatement* states that a tax foreclosure sale does not extinguish a promise to *use the land* in a certain way, but it expressly declines to take a position on whether such a sale would extinguish a promise to *pay for a benefit* received in the use of that land. Restatement of Property § 567, and Caveat (1944). The authors of the Restatement indicate that a promise to pay for benefits received in the use of land "has some analogies" to an easement in gross, and they consider easements in gross to be extinguished by a tax foreclosure sale. Restatement of Property § 567, Caveat (1944); Restatement of Property § 509 (1944). The authors conclude, however, that "[t]he analogy is not sufficiently complete . . . to justify following it in the absence of authority." Restatement of Property § 567, Caveat (1944).

We find the Restatement's suggestion unpersuasive. Because covenants to pay assessments "touch and concern" the land, and thereby usually will run with the land, they bear little resemblance to easements in gross, which are personal to the original parties and do not bind successors in interest. *See* Restatement of Property § 454, and comments (1944). The Restatement's position may make sense, for example, for covenants between a single landowner and a single provider of services to the land, but it is not persuasive under the facts of this case.

[4]The concurrence/dissent argues that because the bylaw providing for the imposition of a lien was not recorded, Looney's debt for postsale assessments should not be secured by a lien on his land. This argument is wholly the invention of the concurrence/dissent. Looney has never argued that the bylaws cannot be enforced against him. Moreover, the bylaws need not have been recorded for Looney to become bound by them. For example, he could have become bound through express agreement in a separate document. In light of the incomplete nature of the record and the absence of argument on these issues, we make no holding as to the imposition of a lien.

only bidders at these sales. Washington courts have not addressed this issue, but we note that an Attorney General's opinion concludes that county properties acquired at tax sales are not subject to assessments. AGO 1923–1924, p. 184. This issue, however, is not presented here.

Looney also contends that our holding would protect from extinguishment not only assessments that arise after the date of a tax sale, but also those arising beforehand. According to Looney, this extension would elevate assessment liens above those for taxes, because foreclosure of a tax lien would not destroy a junior lien for assessments. Our opinion is not subject to extension in this manner. The covenant to pay assessments survives a tax sale, a lien for past due assessments arising prior to the sale does not.

In sum, we hold today that a covenant to pay assessments for the maintenance of neighborhood facilities qualifies as an appurtenant easement under RCW 84.64.460 and, therefore, survives a tax foreclosure sale.[5] The decision of the Court of Appeals is reversed and the case is remanded for additional fact–finding.

CALLOW, C.J., and UTTER, DOLLIVER, PEARSON, ANDERSEN, and SMITH, JJ., concur.

BRACHTENBACH, J. (concurring)—I fully concur with the majority and write only to emphasize that the dissent concerns itself with an issue which is not remotely part of this case.

The dissent attacks the validity of the lien which is provided for in the bylaws and which was ordered foreclosed if the obligation was not paid. The dissent is the only one raising that issue. The lien issue is not raised by the parties, it is not briefed and was no part of the proceedings below.

---

[5]It is worth noting that this case is one of statutory interpretation and is not intended to blur the distinctions between covenants and easements in all instances.

On appeal from the Superior Court to the Court of Appeals, the defendant (respondent here) raised two issues: (1) Did the covenant obligation survive the tax sale?; and (2) If the obligation did survive, should the trial court have entered a personal judgment or is the association's relief "limited to foreclosure of its lien?" Brief of Appellant, at 1–2.

If appellant–defendant below took any position regarding the lien, it was that the lien was the only remedy which would survive the tax sale. Implicit in that position is an admission that the lien was valid for this case.

When we consider what issue is before the court on the petition for review, the dissent's theory becomes even more irrelevant. The Court of Appeals never reached the personal versus lien obligation. The petition for review raises only one issue, to wit: whether the covenant obligation survived the tax sale. Petition for Review, at 1.

The issue raised in the petition for review is the permissible scope of our review. RAP 13.7(b) states in part: "the Supreme Court will review only the questions raised in . . . the petition for review and the answer, unless the Supreme Court orders otherwise upon the granting of the . . . petition."

An answer to the petition was filed. It did not raise any issue about the lien. Our order granting the petition did not preserve the issue. The statute, RCW 65.08.030, relied upon by the dissent, was never cited by anyone, in briefs or oral argument.

The only theory defendant presented in oral argument about a lien is the one disposed of by the majority. Footnote 2.

The dissent's frolic and detour is particularly unwarranted and fraught with potential error. The subject of lien law is often quite technical in nature. The type of lien is of significance. There are potential issues of fact, such as assumption or actual knowledge which are not considered in the facts in the record.

In short, the dissent writes about an issue which is not raised, which therefore is not in the case, which is not briefed, and which potentially has great significance. It is a disservice to the law to render an advisory opinion under these circumstances, even in dissent.

DORE, J. (concurring in part, dissenting in part)—I concur in the majority's decision that the covenant requiring Looney to pay maintenance assessments survived the tax sale under RCW 84.64.460. I dissent, however, from the majority's decision that gives the validity of the lien claimed by Lake Arrowhead to secure Looney's debt for the assessments. I dissent in part because I believe that the lien is not enforceable, regardless of the validity of the covenant.

### FILING THE COVENANT DID NOT GRANT ARROWHEAD A LIEN SECURING UNPAID ASSESSMENTS

As the majority correctly states, the covenant at issue here authorizes Lake Arrowhead to charge property owners such as Looney an assessment for the operation and maintenance of community facilities. The covenant, along with others, was properly recorded. The covenant itself does not grant Lake Arrowhead a lien to secure unpaid assessments. Such a lien is granted by Lake Arrowhead's bylaws. The bylaws, however, were not recorded and are not a lien against the property.

At oral argument, counsel for Looney argued that the covenant did not survive the tax foreclosure sale because the bylaws imposing the lien were not recorded. Lake Arrowhead's failure to record the lien, he argued, meant that the conditions of RCW 84.64.460 had not been satisfied. The majority disposes of this argument correctly by noting that the lien's not being recorded has no bearing on the covenant's validity. Since the covenant was recorded, it met the requirements of the statute and survived the tax sale. Footnote 2.

The premise of the majority's argument is that the lien and the covenant are separate conveyances. While I agree with the majority on this point, it raises an issue which the majority does not address. If the lien and the covenant are separate conveyances, so that the failure to record the lien does not invalidate the covenant, then the fact that the covenant was recorded does not assure that the lien is valid and enforceable. On the contrary, the lien is unenforceable because the bylaws by which Lake Arrowhead claimed that lien were never recorded. Looney owes Lake Arrowhead a debt, imposed by the valid covenant, but that debt is unsecured and is not a lien against the property.

### Lake Arrowhead Was Required To Record Its Bylaws To Obtain a Lien

It appears from the record that the bylaw purporting to impose a lien to secure the assessments was not a regular conveyance, duly executed and acknowledged by Looney. See Clerk's Papers, at 27–28. That alone would not render it unenforceable. The bylaw could qualify as an irregular conveyance as defined in RCW 65.08.030.

However, Lake Arrowhead's failure to record the bylaws does render the lien unenforceable. RCW 65.08.030 provides that documents which are not properly executed and acknowledged: "impart the same notice to third persons, *from the date of recording,* as if the instrument had been executed, acknowledged, and recorded, in accordance with the laws regulating the execution, acknowledgment, and recording of the instrument then in force." Had the bylaws been recorded, Looney would have had constructive notice of the lien and it would have been binding on him as a subsequent purchaser. Since the bylaws were not recorded, the lien is not enforceable against Looney. RCW 65.08.070.

The case of *Murphy v. Seattle,* 32 Wn. App. 386, 647 P.2d 540 (1982) (Durham, J.) is closely analogous. In *Murphy,* Scottish Rite Temple had settled a dispute with the City of Seattle and certain neighbors over the Temple's use of certain parcels of property. The settlement was set

forth in a stipulation. The stipulation contained a covenant restricting two of the lots owned by the Temple, lots 5 and 6, to residential use. The stipulation was never recorded.

After purchasing lots 5 and 6 from the Temple, Murphy attempted to acquire a conditional use permit which would have allowed him to locate his chiropractic clinic on lot 5. The conditional use was denied based on the stipulation's covenant restricting the lot to residential use. The Court of Appeals held that the denial of the conditional use permit was erroneous. Since the stipulation had never been recorded, the Court of Appeals reasoned, it did not provide constructive notice and was not enforceable against Murphy.

> The common thread which runs through these cases is the principle that our recording statute, RCW 65.08.030 *et seq.*, protects parties and their successors who agree to restrict the use of land from subsequent purchasers of the land who wish to escape the burden of the restrictions. The statute imparts constructive notice to such purchasers. It is also clear that in order to enjoy this protection, the original covenantors must record the agreement according to statute.

*Murphy,* at 392.

Here, the lien contained in the bylaws is analogous to the covenant contained in the stipulation in *Murphy.* It is an irregular conveyance which will be binding on a subsequent purchaser only if it is recorded. The bylaws, like the stipulation, were not recorded; the lien, like the covenant, is therefore not binding on Looney.

To impose a lien such as this, without notice to the purchaser, is a violation of due process. In *Brower v. Wells,* 103 Wn.2d 96, 690 P.2d 1144 (1984) we held that foreclosures by the City of Yakima were invalid because of a denial of due process. The City had given notice of foreclosure by publication in a local newspaper. We held that this did not meet the due process standard set by *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652 (1950) and progeny. Due process requires notice which is actually calculated to inform parties of their rights.

*Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 800, 77 L. Ed. 2d 180, 103 S. Ct. 2706 (1983).

Here, the purchaser, Looney, did not even receive constructive notice of the lien which Arrowhead asserts. This clearly falls below the standards of due process, and the majority errs in granting Arrowhead a lien to secure the debt imposed by its valid covenant.

### RESPONSE TO JUSTICE BRACHTENBACH'S CONCURRING OPINION

Both Justice Brachtenbach and the majority argue that the issue of the lien's validity was not raised by the parties. However, the issue of the lien's validity is raised by the majority itself, because of the way it disposes of the issues which the parties *did* raise.

If, on remand, the covenant is found valid, Arrowhead will attempt to recover on its debt. Arrowhead purports to have a lien. In the order appealed from, the trial court authorized Arrowhead to foreclose on its lien. The logic of the majority opinion, however, implies that that lien is *not* valid. I believe we should address the lien's validity for the sake of clarity and efficiency in the disposition of this case, since that issue will inevitably arise on remand.

### CONCLUSION

Since the bylaws purporting to grant a lien to secure payment of assessments under the covenant were not filed, Looney had no constructive notice. The lien, which was never filed, is therefore not binding or enforceable against him. While Looney owes a debt for the unpaid assessments, that debt is unsecured.