[No. 29774-4-II. Division Two. February 18, 2004.]

LAKE LIMERICK COUNTRY CLUB, *Respondent*, v. HUNT MANUFACTURED HOMES, INC., *Appellant*.

248

*James P. Kintner* (of *Kintner Law Group, Inc., P.S.*), for appellant.

*Robert D. Wilson-Hoss* (of *Hoss & Wilson-Hoss*), for respondent.

MORGAN, J. — The primary questions in this appeal are (1) whether a declaration of restrictions is enforceable against the land it describes, and (2) whether a declaration of restrictions, when "correlated"[1] with the articles and bylaws of a homeowners' association, can render a member of the association personally liable for dues accruing during its membership. The trial court answered yes to both questions, and so do we. Accordingly, we affirm.

In the mid-1960s, Lake Limerick Associates (LLA) developed about 1300 residential lots in Mason County. It also incorporated a homeowners' association called Lake Limerick Country Club, Inc. (LLCC). LLCC had articles and bylaws at all times pertinent here.

On December 20, 1967, LLA recorded a "declaration of restrictions" that provided in part as follows:

> The Real property subject to this Declaration is situated in Mason County, State of Washington and is more particularly described as follows:
>
> Lake Limerick, Division No. 4, . . .
>
> . . . .
>
> The owners of any Lot in said Tract or portion of said Tract shall be bound by the Articles of Incorporation and the By-Laws of the Lake Limerick Country Club. Dues and Assessments as levied in accordance with said By-Laws and Articles of Incorporation of the Lake Limerick Country Club, Inc. shall

---

[1] *See Rodruck v. Sand Point Maint. Comm'n*, 48 Wn.2d 565, 577, 295 P.2d 714 (1956) (stating that "articles of incorporation, bylaws, and deeds are correlated documents").

constitute a lien against the lots in the Tract described in Article I and can be foreclosed by Lake Limerick Country Club, Inc. in the manner provided by the laws of the State of Washington for the foreclosure of liens, including interest on the amount due together with reasonable attorney fees.

. . . .

The covenants, conditions and restrictions herein contained shall run with said land and shall be binding and in force and effect until December 31, 2010, for the mutual benefit of all lots and building sites in said Tract.[2]

Even before LLA recorded this declaration of restrictions, it filed LLCC's articles of incorporation with the secretary of state. Insofar as pertinent here, those articles said that LLCC's purposes were (1) "[t]o enforce assessments, liens, charges, restrictions, conditions and covenants existing upon and/or created for the benefit of parcels of real property in the plat or added to the plat of Lake Limerick Country Club, Inc."; and (2) "[t]o fix, establish, levy and collect annually such charges and/or assessments as may be necessary in the judgment of the board of trustees, to carry out any or all of the purposes for which this corporation is formed, but not in excess of the maximum from time to time fixed by the By-Laws."[3]

At least by 1998, LLCC's bylaws provided that each of its members was responsible to pay annual membership dues. The bylaws stated:

The Board of Trustees shall impose, and the members of the corporation and the lots or tracts of land in which they hold an interest shall be responsible for and pay, annual membership dues for the purpose of providing funds for the operation, maintenance, repair, replacement and/or protection of existing real and personal property of the corporation; . . .

. . . .

The requirement to pay dues and assessments is a lien upon each lot within the development, prior to all other liens,

---

[2] Clerk's Papers (CP) at 127-29.

[3] CP at 134-35.

regardless of the status of any account for the same. . . . The aggregate amount of all such dues and assessments, including expenses, fees and costs reasonably imposed pursuant hereto associated with the same shall be a personal obligation of the lot owner and/or purchaser, shall run with the title to the lot, and may be sued upon directly by the corporation.

In addition, the amount of any dues or assessments not paid pursuant to the terms for payment set forth by the Board of Trustees, as well as all expenses, attorney fees and costs, including title search and certificate costs, reasonably incurred in enforcing and collecting judgments for the same shall be a lien upon the land assessed and the membership appurtenant thereto, superior to any and all other liens created or permitted by the owner of such land, and enforceable by foreclosure proceedings in the manner provided by law for foreclosure of mortgages upon land or non-judicial foreclosure of deeds of trust, at the option of the Board of Trustees; provided, that no proceedings for the foreclosure of any said liens in this Article VIII provided, shall be commenced except upon the expiration of four months from and after the day of mailing said notice of dues and/or assessment in this section described. Deficiency judgments in such foreclosure proceedings are specifically authorized.[4]

In early 2000, LLCC was owed a substantial amount of homeowners' dues on Lot 53. On February 28, 2000, Hunt Manufactured Homes, Inc., a Washington corporation, acquired title to that lot. Hunt did not pay all the dues, costs, and fees that were then outstanding. Nor has it paid all the dues, costs, and fees that since have accrued. For convenience, we will refer to dues, costs, and fees simply as "dues."

In October 2001, LLCC sued for the dues owed on Lot 53. It alleged that Lot 53 should be held liable for all such dues and that Hunt should be held personally liable for dues accruing after it had acquired the lot (i.e., for dues accruing after February 28, 2000).

In October 2002, the trial court heard cross-motions for summary judgment. After finding that unpaid dues had

---

4 CP at 144-45.

accrued both before and after February 28, 2000, it entered judgment against Lot 53 for the total amount of such dues, and judgment against Hunt personally for the portion of such dues that had accrued after February 28, 2000. It ruled that a lien secured all such dues, that the lien should be foreclosed, and that the lot should be sold. It ordered that the proceeds of sale be applied first to dues assessed only against the lot and that LLCC receive a deficiency judgment against Hunt for the remaining balance, if any, of dues assessed against Hunt personally. It awarded costs and reasonable attorney fees against the lot and a major portion of those costs and fees against Hunt personally.[5]

Hunt now appeals. It claims that homeowners' dues should not have been charged against Lot 53 because the obligation to pay them did not "run with the land." It also claims that it should not have been held personally liable for such dues because it never contracted to pay them. Finally, it claims that the trial court awarded an amount of dues that was "unconscionable" and an amount of attorney fees that was not reasonable.

## I

The first issue is whether the declaration of restrictions gave rise to a covenant running with the land. If it did, Lot 53 is liable for unpaid homeowners' dues accruing both before and after February 28, 2000. If it did not, Lot 53 is not liable for homeowners' dues.

Covenants running with the land are useful "because they create land-use arrangements that remain intact despite changes in ownership of the land."[6] They "permit the creation of neighborhoods restricted to particular uses, providing a private alternative to zoning; they permit

---

[5] We omit specific amounts from this paragraph because we cannot replicate the arithmetic in the trial court's judgment. Although no one has assigned error to that arithmetic, nothing in this opinion precludes the trial court from later correcting clerical errors, if any. *See* CR 60(a).

[6] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1 cmt. a at 9 (2000).

property to be used as a basis for financing infrastructure, providing a private alternative to taxation; and they permit the creation of stable arrangements for shared use of land, providing an alternative to acquisition of fee-simple interests for transportation corridors and natural-resource exploitation."[7] They may have other uses also.

█ In discussing such covenants, we pattern our terminology after that of the *Restatement (Third) of Property: Servitudes* (hereafter *Restatement*). A servitude is a legal device that creates a right or obligation that runs with the land.[8] A servitude can be, among other things, an easement, profit, or covenant.[9] A covenant is a servitude if either its benefit or its burden runs with the land.[10] When a covenant is a servitude, it may equivalently be described as either a "servitude" or "a covenant running with the land."

█ In the past, some courts—usually *not* including Washington's[11]—have distinguished between a "real covenant" that runs with the land and an "equitable covenant" (sometimes called an "equitable servitude" or "equitable restriction") that runs with the land.[12] Today however, the *Restatement* sensibly explains:

> [T]he differences between covenants that historically could be enforced at law and those enforceable in equity . . . have all but disappeared in modern law. Continuing use of the dual terminology of real covenant and equitable servitude is confusing because it suggests the continued existence of two separate servitude categories with important differences. In fact, however, in modern law there are no significant differences. Valid covenants, like other contracts and property interests, can be enforced and protected by both legal and equitable remedies as

---

[7] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1 cmt. a at 9.

[8] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1(1), at 8.

[9] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1(2), at 8.

[10] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.3(1), at 23.

[11] *Hollis v. Garwall*, 137 Wn.2d 683, 691, 974 P.2d 836 (1999).

[12] *Hollis*, 137 Wn.2d at 691.

appropriate, without regard to the form of the transaction that created the servitude.[13]

Even though the Washington courts have not generally distinguished between "real covenants" and "equitable restrictions,"[14] the Washington Supreme Court has formulated the elements of a servitude in two ways. It has said that a "real covenant" runs with the land if the following conditions are met:

> "(1) the covenant[ ] must have been enforceable between the original parties, such enforceability being a question of contract law except insofar as the covenant must satisfy the statute of frauds; (2) the covenant must 'touch and concern' both the land to be benefitted and the land to be burdened; (3) the covenanting parties must have intended to bind their successors in interest; (4) there must be vertical privity of estate, *i.e.*, privity between the original parties to the covenant and the present disputants; and (5) there must be horizontal privity of estate, or privity between the original parties."[15]

The court also has said that an "equitable restriction" runs with the land if the following elements are met:

> (1) a promise, in writing, which is enforceable between the original parties; (2) which touches and concerns the land or which the parties intend to bind successors; and (3) which is sought to be enforced by an original party or a successor, against an original party or successor in possession; (4) who has notice of the covenant.[16]

Citing *Lake Arrowhead*'s statement that "the covenant[ ] must have been enforceable between the original parties, *such enforceability being a question of contract law* except insofar as the covenant must satisfy the statute of

---

[13] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES, *Introductory Note* at 7-8.

[14] *Hollis*, 137 Wn.2d at 691.

[15] *Lake Arrowhead Cmty. Club, Inc. v. Looney*, 112 Wn.2d 288, 294-95, 770 P.2d 1046 (1989) (quoting *Leighton v. Leonard*, 22 Wn. App. 136, 139, 589 P.2d 279 (1978)).

[16] *Hollis*, 137 Wn.2d at 691.

frauds,"[17] Hunt argues that the "[b]ylaws of a homeowners' association do not by virtue of their recordation become a covenant . . . unless . . . the original deed, agreement, or contract between the association and original purchaser reflected an agreement in writing."[18] Hunt also may be arguing the closely related question of "horizontal privity." Thus, we inquire (A) whether LLA's declaration of restrictions gave rise to a covenant that runs with Lot 53, effective when Lot 53 was first conveyed; (B) whether "horizontal privity" is either inapplicable or satisfied; and (C) whether the statute of frauds is either inapplicable or satisfied.

## A

We first ask whether a servitude was created by LLA's declaration of restrictions, effective when Lot 53 was first conveyed. We do not know whether the declaration was donative or for consideration, so we do not know whether it would be enforceable under contract law.

■ The *Restatement* generally provides that a declaration of restrictions can create a servitude, effective when the subject land is conveyed, regardless of contractual consideration. The *Restatement* indicates:

> Although the common-law origins of easements and covenants are separate, deeds have been used to create both interests since at least the 13th century. At that time, a deed was a sealed piece of parchment. . . .
>
> During the great expansion of servitudes law in the latter half of the 19th century, changes reflecting modern contracts doctrine, equity doctrine and practice, and the simpler conveyance form required by the Statute of Frauds began to appear in servitudes law. One change was the recognition that servitudes could be created by contract as well as by deed. . . .
>
> When equity began enforcing covenants in the mid-19th century, the door was opened for modern contracts doctrine to refashion the ancient covenants law. Contracts to create cov-

---

[17] *See* Br. of Appellant at 20-21 (citing *Lake Arrowhead Cmty. Club, Inc. v. Looney*, 112 Wn.2d 288, 295, 770 P.2d 1046 (1989)) (emphasis added).

[18] Br. of Appellant at 24.

enants were specifically enforceable, and equity enforced covenants without regard to the use of a sealed instrument. Recognition of the contractual nature of covenants has sometimes led modern commentators to assume that covenants can be created only as modern contracts, which normally require consideration. However, under ancient principles, covenants expressed in deeds are effective. With the modern recognition that running covenants are interests in land, it can now be said that covenants can be created by conveyance as well as by contract. Delivery of a deed remains a viable method of creating covenants, as well as other servitudes, in modern law.[19]

According to the *Restatement* then, a servitude can be created by a contract or conveyance[20] that is either "donative" or for consideration.[21] The servitude is not effective "[s]o long as all the property covered by the declaration is in a single ownership,"[22] but it becomes effective "when the developer conveys a parcel subject to the declaration . . . ."[23]

The *Restatement* specifically provides likewise with respect to situations like the one here. It states:

Real-estate developments involving multiple parcels or units almost always include easements and covenants. Typically, the servitudes are set out in a separate document, often labeled a declaration, or reciprocal-easement agreement, which is recorded and then incorporated by reference in the deeds to the individual parcels or units. In older developments, particularly residential subdivisions, servitudes were often set out on the recorded plat instead of in a separate document, and sometimes were included only in the individual deeds. If the circumstances surrounding conveyance of property covered by a recorded declaration indicate that the property is conveyed subject to the general plan, an express reference to the re-

[19] 1 Restatement (Third) of Property: Servitudes § 2.1 cmt. a at 52.

[20] 1 Restatement (Third) of Property: Servitudes § 2.1 cmt. b at 53.

[21] 1 Restatement (Third) of Property: Servitudes § 2.1 cmt. d at 56.

[22] 1 Restatement (Third) of Property: Servitudes § 2.1 cmt. c at 55.

[23] 1 Restatement (Third) of Property: Servitudes § 2.1 cmt. c at 55.

corded declaration in the instrument of conveyance is not necessary to create the servitude.[24]

Regardless of what the recorded declaration of servitudes is titled—it may be called "Declarations of Protective Covenants," "Conditions, Covenants and Restrictions," or something else—one of its functions "is usually . . . to impose duties to contribute to maintenance of common areas and facilities . . . ."[25]

The leading Washington case is in accord. In *Rodruck v. Sand Point Maintenance Comm'n*,[26] a predecessor of the Hayes Investment Company wanted to develop a residential subdivision in Sand Point, then a district near Seattle. In December 1928, Hayes conveyed easements for common facilities to a homeowners' association that today would be a not-for-profit corporation. In January 1929, Hayes recorded a declaration of restrictions. In 1939, the homeowners' association amended its articles and bylaws, and Hayes amended the declaration of restrictions. The basic plan was that "[e]ach lot owner ha[ve] one membership in the [homeowners' association], which is appurtenant to the land owned," and that "[u]npaid assessments become a lien . . . and [be] foreclosable against the individual lots as in the case of mortgages."[27]

In 1942, Rodruck and others bought lots. In the 1950s, they sued the homeowners' association, which counterclaimed for dues assessed under its bylaws. The trial court granted judgment on the counterclaim, and the plaintiffs appealed. The Washington Supreme Court reasoned:

> The [homeowners' association] under its articles of incorporation and bylaws had the right to assess its members for maintenance work and improvements to the streets, and *the deeds from the Hayes Investment Company to appellants' predecessors in interest embodied a covenant running with the*

[24] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.1 cmt. c at 54.

[25] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.1 cmt. c at 54-55.

[26] 48 Wn.2d 565, 295 P.2d 714 (1956).

[27] *Rodruck*, 48 Wn.2d at 568.

*land in that respect, which is binding upon the appellants as subsequent grantees.* Each of the certificates of title held by the appellants recites that it is subject to restrictions and reservations contained in the deed from the Hayes Investment Company to their predecessors in interests.[28]

The court concluded that the dues for which the homeowners' association was counterclaiming "are binding obligations as against appellants and the property to which they hold title in the Sand Point district."[29] Accordingly, the court affirmed the trial court's judgment on the counterclaim.

Other Washington cases are likewise in accord. Although the court in *Hollis v. Garwell* first said that a condition "for finding an equitable restriction in the subdivision setting" is "a promise, in writing, which is enforceable between the original parties,"[30] it went on to note "that the writing containing the covenant is often recorded as a declaration of covenants, or is set forth as a restriction contained in the deed transferring an interest in the property."[31] In *Shafer v. Board of Trustees of Sandy Hook Yacht Club Estates, Inc.,* the court said that " '[i]n modern usage, the term covenant generally describes promises relating to real property that are created in conveyances or other instruments.' "[32] Based on these authorities, we hold that the recorded declaration of restrictions created a servitude (i.e., a covenant running with the land) that became effective with the original conveyance of Lot 53.

---

[28] *Rodruck*, 48 Wn.2d at 573 (emphasis added).

[29] *Rodruck*, 48 Wn.2d at 580-81.

[30] *Hollis v. Garwall*, 137 Wn.2d 683, 691, 974 P.2d 836 (1999).

[31] *Hollis*, 137 Wn.2d at 691 (citation omitted).

[32] 76 Wn. App. 267, 274, 883 P.2d 1387 (1994) (quoting RICHARD R. POWELL, 5 POWELL ON REAL PROPERTY ¶ 670[2] (1988)), *review denied*, 127 Wn.2d 1003 (1995). *See, e.g., Riss v. Angel*, 131 Wn.2d 612, 934 P.2d 669 (1997); *Thorstad v. Fed. Way Water & Sewer Dist.*, 73 Wn. App. 638, 643, 870 P.2d 1046 (1994).

## B

■■ We next inquire concerning "horizontal privity."[33] Such "privity" is not required for an "equitable restriction,"[34] as illustrated by its omission from the elements listed in *Hollis v. Garwell*.[35] The *Restatement* flatly states: "As a matter of common law, horizontal privity between the covenanting parties is no longer required to create a servitude obligation."[36] To whatever extent "horizontal privity" might still required, it is easily met here, for "American courts [have] removed [its] significance . . . by finding privity in a grantor-grantee relationship . . . ."[37] We conclude that "horizontal privity" is not required, or that it is met by the original parties' grantor-grantee relationship.

## C

■ We next inquire about the statute of frauds that applies when transferring an interest in land. RCW 64-.04.010 provides that every conveyance or encumbrance shall be by deed, and RCW 64.04.020 provides that every deed shall be in writing.[38] The declaration of restrictions was in writing and signed by the grantor. Assuming that RCW 64.04.010 and RCW 64.04.020 apply, they were met.

## D

■ Neither party disputes the remaining elements of a servitude. *Rodruck* squarely held that a covenant to pay

---

[33] For the historical evolution of this concept, see 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.4 cmt. a.

[34] William B. Stoebuck, *Running Covenants: An Analytical Primer*, 52 WASH. L. REV. 861, 897 (1977).

[35] *See Hollis*, 137 Wn.2d at 691.

[36] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.4 cmt. b at 97. Section 2.4 is titled, "Horizontal Privity Is Not Required to Create a Servitude" and provides in its black-letter text, "No privity relationship between the parties is necessary to create a servitude." 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.4, at 96.

[37] 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.4 cmt. a at 29.

[38] Hunt quotes and seems to rely on RCW 19.36.010. By its terms, however, that statute does not apply here.

homeowners' dues for maintenance and repair of common facilities "touches and concerns" the land.[39] LLA obviously intended to obligate the land, for the declaration of restrictions expressly states that the "restrictions herein contained shall run with said land."[40] Hunt is a successor in interest to the original grantee of Lot 53, and no more is required for so-called "vertical privity." Hunt complains that it did not have *actual* notice of the declaration of restrictions, but it cannot reasonably dispute that it had *constructive* notice of the declaration, which was recorded long before Hunt took title, and also of the articles and bylaws to which the declaration expressly referred.[41] The record shows a covenant running with the land, and the trial court did not err by assessing unpaid homeowners' dues against Lot 53.

## II

The next issue is whether the trial court erred by holding Hunt personally liable for dues accruing during its ownership of Lot 53. In *Rodruck*, the Washington Supreme Court held that the bylaws of a homeowners' association, "in effect, constitute a contract between the [association] and its members."[42] Accordingly, it concluded that the dues and assessments in issue were "binding obligations *as against appellants* and the property to which they hold title in the Sand Point district."[43]

Although *Rodruck* did not specify the theoretical basis for its ruling, the Supreme Court had earlier "recognize[d] two classes of implied contracts: those implied in fact, and

---

[39] *Rodruck*, 48 Wn.2d at 576.

[40] CP at 127.

[41] *Kendrick v. Davis*, 75 Wn.2d 456, 464-65, 452 P.2d 222 (1969); *Valentine v. Portland Timber & Land Holding Co.*, 15 Wn. App. 124, 131, 547 P.2d 912, *review denied*, 87 Wn.2d 1015 (1976).

[42] *Rodruck*, 48 Wn.2d at 578.

[43] *Rodruck*, 48 Wn.2d at 580-81 (emphasis added).

others implied in law."[44] A contract implied in fact is based on "facts and circumstances showing a mutual consent and intention to contract."[45] A contract implied in law is based not on "facts and circumstances showing a mutual consent and intention to contract,"[46] but rather on "the fundamental principle of justice that no one should be unjustly enriched at the expense of another."[47]

Taken in the light most favorable to Hunt, this record will not support a contract implied in fact, for it will not support a mutual intention to contract. Even if the bylaws be read as an offer to maintain and repair common facilities for Hunt's benefit in exchange for the payment of homeowners' dues, the record does not show that Hunt had actual (as opposed to constructive) notice of such bylaws when it took title to Lot 53. Thus, we cannot imply that Hunt actually intended to contract.

Although this record will not support an implied in fact contract, it will support an implied in law contract. Hunt acquired property that carried with it the right to enjoy certain common facilities. Even if Hunt elected not to exercise that right, Hunt was benefited because its property was worth more as a result. Hunt would be unjustly enriched if it could retain that benefit without paying for it, and thus the law will imply a contract to pay dues imposed according to LLCC's obligation to act "fairly and within the scope of the corporate functions outlined in its charter and bylaws."[48] The trial court did not err by holding Hunt

---

[44] *Chandler v. Wash. Toll Bridge Auth.*, 17 Wn.2d 591, 600, 137 P.2d 97 (1943); *see also Milone & Tucci, Inc. v. Bona Fide Builders, Inc.*, 49 Wn.2d 363, 367-68, 301 P.2d 759 (1956).

[45] *Chandler*, 17 Wn.2d at 600.

[46] *Chandler*, 17 Wn.2d at 600.

[47] *Milone & Tucci*, 49 Wn.2d at 367; *see also Chandler*, 17 Wn.2d at 600-01.

[48] *Rodruck*, 48 Wn.2d at 577 ("It was for the [homeowners' association] as trustee, through its board of trustees, to determine what work was to be done in maintaining and improving the streets and what charge would be made against the members for such work. The right to demand payment of the charges levied carried with it an obligation on the part of the [association] to exercise the

personally liable for dues that accrued during its ownership of Lot 53.

## III

Four issues remain. Hunt argues that "a successor in title is not personally obligated for the non-payment of dues and assessments incurred by a prior owner of [the] property,"[49] and thus that it "is not liable for the wrongs of its predecessors."[50] But the trial court expressly limited Hunt's personal liability to unpaid dues that had accrued during Hunt's ownership of Lot 53.

Hunt argues that the trial court's award is "unconscionable" because it includes dues, assessments, and finance charges "for nearly double the amount of the value of the property . . . ."[51] Under the circumstances here, however, we perceive neither substantive nor procedural unconscionability.[52]

Hunt argues that the trial court granted attorney fees that included amounts incurred unreasonably or in bad faith. The record does not so show, and the trial court did not abuse its discretion.[53]

LLCC claims reasonable attorney fees on appeal. Having prevailed, it is entitled to such fees so long as it complies with RAP 18.1.

Affirmed.

QUINN-BRINTNALL, A.C.J., and ARMSTRONG, J., concur.

---

discretion vested in it fairly and within the scope of the corporate functions outlined in its charter and bylaws.").

[49] Br. of Appellant at 32 (emphasis omitted).

[50] Br. of Appellant at 34.

[51] Br. of Appellant at 34 (emphasis omitted).

[52] *See Johnson v. Cash Store*, 116 Wn. App. 833, 843-46, 68 P.3d 1099, *review denied*, 150 Wn.2d 1020 (2003).

[53] *Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 71-72, 847 P.2d 440 (1993); *Yousoufian v. Office of King County Executive*, 114 Wn. App. 836, 855, 60 P.3d 667, *review granted*, 150 Wn.2d 1001 (2003).