[No. 24036-3-III. Division Three. November 13, 2007.]

810 PROPERTIES ET AL., *Respondents*, v. JANEICE A. JUMP, *Appellant*.

*Janeice A. Jump*, pro se.
*John P. Gilreath*, for respondents.

¶1 SCHULTHEIS, A.C.J. — This case involves a dispute over a roadway that runs through Janeice Jump's property. In 1999, Ms. Jump blocked access to this roadway at the southern end of her property. The Eatons[1] and 810 Properties, who owned property to the south of Ms. Jump, brought this action to establish a right of way easement over the disputed area. The Eatons also asked for damages for lost grazing rights. The trial court concluded that express and prescriptive easements burden Ms. Jump's property and ordered Ms. Jump to remove the barriers and pay damages to the Eatons for lost grazing rights. Ms. Jump appeals, contending the trial court erred in concluding that (1) an express easement exists on the south half of her property, (2) the Eatons established adverse use of the roadway in the north portion of her property, and (3) the Eatons retained grazing rights on 810 Properties' land. We reject her contentions and affirm.

## FACTS

¶2 The disputed area in this case begins in the north half of section 3, township 16 in Kittitas County at the south end of Payne road where a road ("offshoot" road) veers southeast through Ms. Jump's northern triangular parcel of land. The road then connects to a roadway at the northern border of

---

[1] The Eatons consist of Jack W. and Beneitta E. Eaton, John N. Eaton, Robert A. Eaton, Ken W. Eaton, Kathie Wise, and Sherilyn Eaton.

Ms. Jump's property in the south half of section 3 where it continues to the southern border of her property. Property owners to the south of Ms. Jump's property historically used this road to truck cattle to grazing areas, access springs, and repair fences. Others used the road for domestic and recreational purposes. This use ended in 1999 when Ms. Jump blocked the southern portion of the roadway with apple bins. She also removed a fence on the southern boundary of her property in section 3, effectively precluding southern property owners from grazing cattle on their property.

¶3 The Eatons and 810 Properties (Eaton/810), who owned property to the south of Ms. Jump, filed suit to establish a right of way easement through Ms. Jump's property, to order Ms. Jump to replace the boundary fence and remove the barriers on the roadway, and to grant the Eatons a judgment for the lost value of their grazing rights.

¶4 Exhibits introduced at trial showed that during the early 1900s, Angus McPherson acquired the south half of section 3, including property to the south. In 1931, he conveyed approximately 197 acres in the north half of the southwest quarter of section 3 to Ellison Mundy. The deed contained the following clause:

> RESERVING AND EXCEPTING unto the grantors, their heirs and assigns, . . . a right of way of the width of forty (40) feet for a roadway to be constructed and maintained by the grantors, their heirs, transferees and assigns, extending southerly along or near the 1/16th line from about the 1/16th corner on the north line of the Southwest Quarter of said Section 3, a distance of 637.30 feet, more or less, to the north line of adjoining lands owned by the grantors in the southwest quarter of Section 3, for use as a means of ingress and egress thereto.

Ex. 9.

¶5 In 1941, Mr. McPherson's successors transferred the south half of section 3 (less the 197 acres sold to Mr. Mundy) to Alex and Agnes Dunnett, reserving a "right of way for [a]

road 30 feet in width in a general northerly and southerly direction . . . following present roadway across said land, as now located and constructed." Ex. 11. Barbara and Gordon Prentice acquired this property in 1943, "with a right of way for a road 30 feet in width" and "[s]ubject to all reservations for existing roads and ditches." Ex. 13. In 1949, the Eatons acquired the Prentice property subject to the 30 foot roadway.

¶6 In 1955, Ms. Jump and her husband at that time, Robert Diefenbach, acquired the 197 acre Mundy parcel subject to "all reservations, easements and rights of way apparent as of record." Ex. 16. The Diefenbachs divorced in 1984, and Ms. Jump received the 197 acre parcel in the divorce.

¶7 In 1982, the Eatons entered into an option agreement to sell their property north of the freeway in section 3 to 810 Properties, a development company. Under the option agreement, the Eatons retained the ingress and egress easements appurtenant to the property and free grazing rights until the property was sold or developed. In the event of a resale, the Eatons were to retain a right of first refusal to lease the property for grazing purposes.

¶8 In 1934, Clarence and Addie Hartman acquired property in the southeast quarter of the northwest quarter of section 3 subject to an easement for "any public roads heretofore laid out or established and now existing over and across any part of the premises." Ex. 24. In 1947, they transferred the east half of the northwest quarter of section 3 to Wallace and Violet Huppert subject to all rights of way for existing roads. At the time of this transfer, the offshoot road from Payne road was in existence and the property was cultivated.

¶9 In 1984, Danny and Mary Nouwens acquired the Huppert property subject to any easements. In 1993, Ms. Jump acquired a part of the southeast quarter of the northwest quarter of section 3 from the Nouwens subject to all "easements and rights of way apparent or of record." Ex. 27.

¶10 At trial, Mr. Diefenbach testified that he never asked permission to use the offshoot road in the north half of section 3. He stated that Mr. Huppert asked him if he could move the road, but Mr. Diefenbach refused the request. Mr. Diefenbach also testified that when he and Ms. Jump acquired their property in 1955, the roadway was apparent and regularly used for many purposes. He noted that the Eatons regularly used the road to reach outbuildings and corrals, to check on their cattle, and to repair fences, and sportsmen used it.

¶11 Jack Eaton testified that he regularly used the road to truck cattle to grazing grounds in the late summer and fall. He also used the road to access water sources and corrals for his cattle and for maintenance work. He stated that when they purchased the property, "we understood that there was rights to get to those corrals from the north side because it was the main way through to service especially the Lost Spring area." Report of Proceedings (RP) at 101. He used the road without any interference until Ms. Jump barricaded its southern entry.

¶12 Ms. Jump did not dispute that in 1999 she unilaterally removed the boundary fence on the southern portion of her property and placed apple bins on the south end of what she characterized as the "path." RP at 60. On November 26, 1999 she advised Mr. Eaton in writing not to come on her property or she would call the sheriff. She explained that she blocked the "path" when she became aware "that if anyone allowed somebody to even walk across their property over a period of years then they could claim that as theirs and then you will be in a lawsuit." RP at 75. She also wanted to block access to people who used the roadway for recreational purposes and conceded that she was worried 810 Properties would develop the property south of her for residential purposes.

¶13 John Eaton testified it cost about $5 a head for one month of grazing and that he averaged 100 head of cattle a month on the pasture each year. He testified that he could not graze his cattle on his property after Ms. Jump removed

the fence. There was testimony that it would cost $4,987.22 to replace the fence.

¶14 The trial court ruled in favor of Eaton/810, concluding that "easements exist through Jump's south half of Section 3 by color of title to the enjoyment of the dominant estate to the south of the Jump property." Clerk's Papers (CP) at 82. It also concluded that the "Eatons and their successors in interest enjoy a prescriptive easement over the offshoot road in the southeast quarter of the northwest quarter of Section 3." CP at 83.

¶15 The court found that Ms. Jump interfered with the Eatons' use of the easement and ordered the barricades removed. It also found that the Eatons had grazing rights pursuant to the statutory warranty deed executed in 1982 regardless of the "expiration of a grazing lease" executed in 1988 and that Ms. Jump's denial of access to pastureland damaged the Eatons to the extent they lost grazing opportunities of $5 a head for one month, each year for six years for 100 cows. CP at 84 n.14. Accordingly, it entered a $3,000 judgment against Ms. Jump. Finally, it ordered Ms. Jump to replace the fence or pay the cost of replacing it.

¶16 Ms. Jump appeals, challenging the trial court's conclusions that easements through color of title and prescription run through her properties. She also claims that the Eatons did not retain grazing rights.

## ANALYSIS

### Standard of Review

¶17 We determine the extent of a right acquired by an express easement from its terms. We review to determine whether the trial court properly construed those terms to give effect to the parties' intention. *Brown v. Voss*, 105 Wn.2d 366, 371, 715 P.2d 514 (1986). An appellate court reviews findings and conclusions to determine whether the trial court's findings of fact are supported by substantial evidence, and if so, whether those findings support the trial court's conclusions of law. *Landmark Dev., Inc. v. City of*

*Roy*, 138 Wn.2d 561, 573, 980 P.2d 1234 (1999). Substantial evidence is a "sufficient quantity of evidence to persuade a fair-minded, rational person of the truth of the allegation." *State v. Echeverria*, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997). We review the trial court's conclusions of law de novo, according great significance to the court's conclusions of law. *State v. Collins*, 121 Wn.2d 168, 174, 847 P.2d 919 (1993).

### *South Half of Section 3—Color of Title Easements*

¶18  Ms. Jump first contends that the trial court erred in concluding that the 1931 deed created a 40 foot wide, 637 foot long easement "following the existing road" to the lands of the south. CP at 95. Specifically, she argues that because the offshoot road from Payne road did not exist in 1931, there was no right of access between the southern part of Payne road and the northern part of the 40 foot easement described in the 1931 deed. Without such access, she argues, the 40 foot portion of the easement could not have existed. Ms. Jump further argues that the 1931 deed limited access to the properties owned by the grantors to the southwest quarter of section 3.

¶19  An easement is a property right separate from ownership that allows the use of another's land without compensation. *City of Olympia v. Palzer*, 107 Wn.2d 225, 229, 728 P.2d 135 (1986). Easements may be created by written instrument or by adverse possession. *State ex rel. Shorett v. Blue Ridge Club, Inc.*, 22 Wn.2d 487, 494, 156 P.2d 667 (1945). The easements at issue in the south half of section 3 were created by express grant.

¶20  In determining the scope of express or color of title easements, we look to the deed's language, the intention of the parties connected with the original easement, the circumstances surrounding the deed's execution, and the manner in which the easement has been used. *Scott v. Wallitner*, 49 Wn.2d 161, 162, 299 P.2d 204 (1956); *Brown v. State*, 130 Wn.2d 430, 437, 924 P.2d 908 (1996); *Logan v. Brodrick*, 29 Wn. App. 796, 799, 631 P.2d 429 (1981). The

law assumes parties to an easement contemplated changes in the use of the easement that may have not existed at the time of the grant. *Logan*, 29 Wn. App. at 800.

¶21 The trial court concluded that the 1931 McPherson deed created a 40 foot wide, 637 foot long easement for access to lands to the south. It concluded that from that point the easement then narrowed to 30 feet in width to the north line of the property owned by 810 Properties. The court found the parties intended the easements to be used for "roadway purposes for ingress and egress to the properties to the south of defendant's property, and the easements were appurtenant to those properties." CP at 94.

¶22 The evidence supports the court's conclusion that an easement exists in the south half of section 3 for the use of the dominant estates to the south of Ms. Jump's property. Aerial photographs show the road in question going south through Ms. Jump's property and up to Lost Spring. The 1931 deed explicitly reserved to the grantors a 40 foot right of way "to be constructed" extending 637 feet to the southwest quarter of section 3. Ex. 9.

¶23 Although the road was not built in 1931, the testimony at trial established that from its construction, sometime between 1931 and 1942,[2] the roadway was regularly used by landowners to the south to repair fences, and was a primary access to springs and corrals to the south of Ms. Jump's property. One of these springs, McPherson Spring, was just inside the south boundary of section 3 and another, Lost Spring, was to the southwest in section 9. The entire area to the south of Ms. Jump's property was rangeland. Mr. Eaton used the roadway to truck hundreds of cattle to northern grazing grounds in the summer. Ms. Jump admitted that 100 to 200 people a year used the road for recreational purposes.

¶24 In view of these circumstances, the court did not err in concluding that the original intent was to reserve an

---

[2] The first aerial photograph of the road was taken in 1942.

unrestricted right of way for access to lands to the south and west of the Jump property.

¶25 Ms. Jump also contends that the court erred in finding that the 40 foot easement narrows to a 30 foot easement that follows the existing road, arguing that "no part of the existing roadway which passes just to the east of Mrs. Jump's home is in the Northwest ¼ of the Southwest ¼ of Section 3." Appellant's Br. at 27. She also argues that because the deeds conveying southern property to the Prentices, Eatons, and 810 Properties deleted any reference to the "present roadway," any easement disappeared.

¶26 The May 19, 1941 McPherson to Dunnett deed describes a 30 foot right of way for a road going across "the SE ½ NW ¼ SW ¼ . . . following present roadway across said land, as now located and constructed." Ex. 11. However, as noted by Ms. Jump, subsequent deeds conveying property subject to the 30 foot roadway did not reference the "present roadway." Exs. 13, 15, 18. Nevertheless, the trial court concluded that the "appurtenant easements passed to the owners of the property to the south of the defendant's property whether they were mentioned in the transmittal deeds or not." CP at 94.

■ ¶27 Contrary to Ms. Jump's claim, this conclusion is not in error. It is well settled that appurtenant easements are transferred to the owner of the dominant estate with title to the property even if not mentioned in the deed. *Kirk v. Tomulty*, 66 Wn. App. 231, 239, 831 P.2d 792 (1992).[3] The easement at issue here was appurtenant as it benefited the dominant estates to the south of Ms. Jump's property and ran to the southern border of her property. *See id.* at 240 (an easement that extends to the end of the servient property is consistent with an intent to serve the adjacent property).

---

[3] This court distinguished "in gross" and "appurtenant" easements as follows: "An easement in gross directly benefits one person, and easement appurtenant benefits a particular piece of property." *M.K.K.I., Inc. v. Krueger*, 135 Wn. App. 647, 655, 145 P.3d 411 (2006), *review denied*, 161 Wn.2d 1012 (2007). Easements in gross are not favored; it is strongly presumed that an easement is appurtenant. *Id.*; *Pioneer Sand & Gravel Co. v. Seattle Constr. & Dry Dock Co.*, 102 Wash. 608, 173 P. 508 (1918).

The failure of the deeds after 1941 to explicitly mention the "present roadway" is not fatal. The 30 foot easement passed to all subsequent owners of the burdened land.

¶28 In any event, a successor in interest to the servient estate takes the estate subject to the easements if the successor had actual, constructive, or implied notice of the easement. *Mahon v. Haas*, 2 Wn. App. 560, 468 P.2d 713 (1970); *Wilhelm v. Beyersdorf*, 100 Wn. App. 836, 999 P.2d 54 (2000). Ms. Jump unquestionably had notice of the easement that runs through the southern half of section 3. The roadway was well defined and apparent at the time she and her ex-husband acquired the property. The roadway is clearly visible in aerial photographs. The 1955 transfer document was specifically subject to "all reservations, easements and rights of way apparent and of record." Ex. 16. And Mr. Diefenbach met with the grantor who specifically pointed out the easement, leaving him with the belief that the southern property owners had a right to use the road. Notice to one spouse is notice to the other. *Chase v. Beard*, 55 Wn.2d 58, 346 P.2d 315 (1959), *overruled in part on other grounds by In re Marriage of Brown*, 100 Wn.2d 729, 675 P.2d 1207 (1984).

¶29 Next, Ms. Jump contends that the Eaton/810 access to the roadway should be limited to 15 feet because the existing roadway is currently 15 feet in width. Again, her contention is without merit. Generally, the dimensions of an easement do not contract merely because the holder fails to use the entire easement area. When one enters upon land under color of title and possesses only part of the land, he or she will be deemed to have possession of the entire tract. *Yakima Valley Canal Co. v. Walker*, 76 Wn.2d 90, 94, 455 P.2d 372 (1969). In this case, the 1931 and 1941 deeds specifically delineate 40 and 30 foot easements. Accordingly, the trial court did not err in concluding that property owners to the south of Ms. Jump's property have a right to access easements of those respective widths.

*Prescriptive Easement—North Half of Section 3*

¶30 Ms. Jump further contends that the trial court erred in concluding that a prescriptive easement burdens her property in the north half of section 3. The burden of proving the existence of a prescriptive right always rests upon the one benefited by the easement. *Anderson v. Secret Harbor Farms, Inc.*, 47 Wn.2d 490, 288 P.2d 252 (1955). We start with the presumption that the use of another's property is permissive. *Kunkel v. Fisher*, 106 Wn. App. 599, 602, 23 P.3d 1128 (2001). Further, prescriptive rights are not favored. *Roediger v. Cullen*, 26 Wn.2d 690, 706, 175 P.2d 669 (1946).

¶31 The person benefited by the prescriptive right must prove: (1) use adverse to the owner of the servient land; (2) use that is open, notorious, continuous, and uninterrupted for 10 years; and (3) knowledge of such use by the owner at a time when he was able to assert and enforce his rights. *Mood v. Banchero*, 67 Wn.2d 835, 841, 410 P.2d 776 (1966); *Mountaineers v. Wymer*, 56 Wn.2d 721, 722, 355 P.2d 341 (1960). A trial court's findings on the elements of prescriptive easements are mixed questions of law and fact. *Crites v. Koch*, 49 Wn. App. 171, 176, 741 P.2d 1005 (1987).

¶32 Possession is adverse if the claimant uses the property as if it were his own, without regard for the claims of others, without asking permission, and under a claim of right. *Malnati v. Ramstead*, 50 Wn.2d 105, 108, 309 P.2d 754 (1957). "Hostile use of real property by an occupant or user does not import ill will, but imports that the claimant is possessing or using it as owner, in contradistinction to possessing or using the real property in recognition of or subordinate to the title of the true owner." *Id.*

¶33 With respect to the disputed roadway in the north half of section 3, the court found that (1) neither the Eatons nor the Diefenbachs asked for permission to use the road; (2) from the roadway's construction prior to 1942 to the present, the roadway has been apparent, and its use open

and notorious; (3) the use of the roadway was not interrupted until Ms. Jump blocked the Eaton family access; (4) the roadway has been used for a variety of purposes, including repairing fences, trucking cattle, Kittitas Reclamation District (KRD) maintenance work, and hunting; and (5) the use has been exclusive and hostile since 1949.

¶34 Ms. Jump assigns error to these findings, arguing the record lacks any evidence of adverse use. But substantial evidence supports the court's findings. First, the off-shoot road is readily apparent in aerial photographs of the area as early as 1942. By the time Ms. Jump acquired the northern parcel of property in 1993, the road had been in use for at least 50 years.

¶35 Testimony at trial established that at least since 1942, the roadway was continuously used for multiple purposes by property owners to the south, the KRD, and sportsmen. Mr. Eaton testified that when he acquired his property in 1949, he believed he had a right to use the offshoot road and never asked permission to use it. He regularly used the road to truck cattle and for recreational purposes.

¶36 Mr. Diefenbach also used the road continuously after 1955, never asking permission. Significantly, he also refused Mr. Huppert's request to move the road. Ms. Jump admitted that before she owned the northern parcel of land, she never asked for permission to use the road.

¶37 Despite this evidence of adverse use, Ms. Jump, citing *Crites*, 49 Wn. App. 171, contends that the Eatons' use of the offshoot road was merely permissive. But *Crites* is inapposite. In that case, a farmer's use of a field near his own land for farming was deemed a "neighborly accommodation" and not hostile because the farmer acted in ways that indicated he recognized others' right to use the field. *Id*. at 178. In rejecting the farmer's claim of a prescriptive right, the court explained, "[p]ermissive use is not hostile and does not commence the running of the prescriptive period. Use that is permissive in its inception cannot ripen into a prescriptive right unless the claimant has made a

distinct and positive assertion of a right hostile to the owner." *Id.* at 177 (citation omitted).

¶38 In contrast to *Crites*, the use of the offshoot road was distinctly hostile. The Eatons' and their predecessors' unchallenged use of the offshoot road since at least 1942 cannot be characterized as "neighborly accommodation." *Id.* at 178. In fact, the Eatons and their predecessors used the road as owners would. *See ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 758, 774 P.2d 6 (1989) (the test of adverse use is whether the party claiming adverse possession exercised dominion over the land as a true owner would). Accordingly, we reject Ms. Jump's assertion that the use of the road was merely permissive.

¶39 Next, Ms. Jump argues that the Eatons' use of the roadway was sporadic and seasonal, and therefore, not continuous. However, "continuous and uninterrupted use" does not imply *constant* use of a roadway. *See, e.g., Lee v. Lozier*, 88 Wn. App. 176, 184, 945 P.2d 214 (1997) (finding seasonal occupancy of a summer house did not destroy the continuity of claimant's use, where the use was consistent with that of a true owner); *see also Malnati*, 50 Wn.2d at 108 (noting the term "uninterrupted" means that " 'the claimant must not have shared the use with the true owner, nor suffered any act of dominion by him, such as an inter-ruption' ") (quoting 1 Samuel Charles Wiel, Water Rights in the Western States § 584, at 630 (3d ed. 1911)). Here, until Ms. Jump blocked the southern access to the roadway, its use, even if seasonal, was not interrupted by an act of dominion by the true owners for over 50 years.

¶40 Ms. Jump also contends that the court's granting of a 40 foot prescriptive easement is overly broad because the width of actual use is only 10 to 15 feet. The court concluded that "the reasonable enjoyment of the prescriptive ease-ment portion should coincide with the northerly 637 feet of the easement in the south half . . . . Thus, the prescriptive easement should be 40-feet in width, 20-feet on either side of the centerline of the roadway to a point where it joins up

with the 40-foot easement in the south half of Section 3." CP at 95.

¶41 The extent of the rights acquired through prescriptive use is determined by the uses of the easement. *Nw. Cities Gas Co. v. W. Fuel Co.*, 17 Wn.2d 482, 486-87, 135 P.2d 867 (1943). The easement acquired extends only to the uses necessary to accomplish the purpose for which the easement was claimed. *Yakima Valley Canal Co.*, 76 Wn.2d at 94.

¶42 One of the purposes of the offshoot road was to access Payne road from the southerly 40 foot easement. Mr. Eaton measured the southern roadway where it joined the offshoot road and testified that it was 40 feet wide. We agree with the trial court that 40 feet is the amount reasonably necessary to connect to the easement in the south half. This is also the width reasonably necessary to accomplish its other purposes, including trucking cattle to grazing areas.

¶43 The presumption of permissive use has been overcome by the evidence that the road's use has been open, notorious, continuous, and uninterrupted, and adverse to the owner of the property. Because of the continuous adverse use of the offshoot road for more than 10 years, the trial court did not err in concluding that the Eatons acquired an easement by prescription.

*Grazing Rights*

¶44 Finally, Ms. Jump contends that the trial court erred in concluding that Mr. Eaton owned grazing rights in the property sold to 810 Properties. She argues that the provision for free grazing rights in the January 1, 1982 deed merged with the March 1, 1982 warranty deed, which provided only a right of first refusal to lease the property for grazing purposes.

¶45 The trial court concluded that Mr. Eaton "had grazing rights pursuant to the statutory warranty deed executed in 1982 (Exhibit 18) regardless of the 'expiration of a grazing lease' executed in November 1988 (Exhibit 19)." CP at 84 n.14.

¶46 Ms. Jump cites *Barnhart v. Gold Run, Inc.*, for the general proposition that " '[a] deed made in full execution of a contract of sale of land merges the provisions of the underlying contract.' " *Barnhart v. Gold Run, Inc.*, 68 Wn. App. 417, 423, 843 P.2d 545 (1993) (alteration in original) (quoting *Kunkel v. Meridian Oil, Inc.*, 54 Wn. App. 675, 678, 775 P.2d 470 (1989), *rev'd on other grounds*, 114 Wn.2d 896, 792 P.2d 1254 (1990)). But that case does not apply to our facts. *Barnhart* involved a dispute between immediate parties to a real estate contract and a subsequent fulfillment deed. *Barnhart*, 68 Wn. App. at 418. Here, the parties to the agreements at issue are the Eatons and 810 Properties, not Ms. Jump. The free grazing provision was effective only between the Eatons and 810 Properties, and they do not dispute the provision. Eaton/810 correctly notes that the provision for grazing rights was not contained in the deed because "[w]hat was to be effective against a successor was the right of first refusal, and that was contained in the deed." Br. of Resp'ts at 46.

¶47 In any event, Ms. Jump does not assign error to the court's findings regarding her unilateral removal of the fence or the value of the grazing rights. Therefore, such facts are verities on appeal. There is no dispute that without the fence, the property owned by 810 Properties could not be grazed. There is no dispute that the property had grazing value and had been used for grazing cattle for over 50 years. 810 Properties does not dispute that the Eatons had grazing rights on its property. Therefore, the trial court did not err in concluding that the Eatons had grazing rights to 810 Properties' property.

## CONCLUSION

¶48 Holding that substantial evidence supports the trial court's findings of fact and the findings support its conclusions of law, we affirm.

BROWN, J., and KATO, J. PRO TEM., concur.