IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CHEWELAH GOLF AND COUNTRY CLUB ASSOCIATION, a Washington corporation, | ) ) ) ) | No. 31748-0-III |
| Respondent and Cross-Appellant, | ) ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| WILBUR "WOODY" WILLIAMS, a single man, | ) ) ) ) | |
| Appellant. | ) ) | |

LAWRENCE-BERREY, J. — Chewelah Golf Course and Country Club Association (CGCC) recorded protective covenants in December 1981. One covenant limits the type of landscaping that a lot owner may plant so that golfers can hit their balls in golf playing areas marked on owners' lots. CGCC contends that this covenant, combined with out-of-bounds markers, creates a 35-foot easement on Mr. Williams's three lots, which are the subject of this action. The lower court agreed with CGCC, and granted CGCC summary judgment on its claims of express easement, equitable servitude, and prescriptive easement.

We hold, as a matter of law, that the covenant at issue does not create an express easement. We also hold that issues of material fact preclude summary judgment on CGCC's claims of equitable servitude and prescriptive easement. We, therefore, reverse the lower court's grant of summary judgment on those three claims in favor of CGCC.

## FACTS

In 1975, several Chewelah residents saw the need for a golf course and formed CGCC.[1] The corporate articles expressly state CGCC's purpose to be the construction, maintenance, and operation of a golf course and country club, with residences. In December 1981, CGCC recorded covenants and a plat diagram toward developing the property surrounding the Chewelah Golf Course. The old nine was incorporated in the plat.

Between 2003 and 2005, Mr. Williams purchased three lots on the old nine portion of the Chewelah Golf Course. Lot 28 is located along fairway 1. Lots 14 and 16 are located along fairway 2. Two of the three lots were undeveloped, and the other had a shed on it. Mr. Williams built his home on lot 16 and landscaped the property.

---

[1] The golf course was created around an existing nine-hole golf course ("old nine.")

The lots purchased by Mr. Williams are subject to protective covenants drafted by CGCC. Mr. Williams received a copy of the protective covenants when he purchased his first lot in 2003. The covenants run with the land.

Central to this dispute, paragraph 6 under building and landscape restrictions states:

> Front yard landscaping on all lots facing or bordering the fairway shall be restricted to grass, trees and flowers. The golf playing area of said front yard area shall be marked and any golf balls entering the lot beyond the marked area shall be out of bounds and not played by the golfer.

Clerk's Papers (CP) at 85. No covenant mentions a 35-foot easement for golf play. No markers were located on Mr. Williams's property at the time of his purchase.

In 2007, Mr. Williams began having conflicts with golfers hitting balls onto his property. This conflict was temporarily resolved, but later escalated. In September 2010, CGCC filed suit against Mr. Williams, alleging the existence of an easement for golfers to use the 35 feet on Mr. Williams's lots that were adjacent to fairways 1 and 2. CGCC also claimed that Mr. Williams owed money for delinquent membership dues. In 2012, CGCC moved for summary judgment on its easement claim.

CGCC presented declarations from one of the original developers of CGCC, William Daschiell. Mr. Daschiell stated that since the creation of CGCC, association members and guests used the in-play area of private lots as part of the course. During the

3

first few years of the subdivision, CGCC filled, graded, and landscaped portions of the private lots that were used as in-play areas. He explained that the covenants provide for an in-play area and members have always claimed a right to use the area.

CGCC president D. Kay Smith stated in her declaration that the in-play area is defined by out-of-bounds markers on private lots. The markers are located 35 feet from the property line. She stated that she has lived on the course since 2003 and maintenance and golf play occurred in the in-play area as long as she can remember. Without this in-play area, she said the fairways of the old nine would be inappropriately narrow.

Joe Scates stated in his declaration that he purchased property on the old nine in 1982 and was part of the original team that placed the out-of-bounds markers on the old nine. Starting in 1981, the team experimented with different distances for the out-of-bounds markers. First, the markers were set at 25 feet onto adjacent lots, but the team determined that the width of the fairway was too narrow for play. Next, the team tried 50 feet, but decided that the in-play area was too close to residences. Finally, the team selected 35 feet as the best distance and placed out-of-bounds markers on the lots adjoining the fairways at that distance. He testified that 35 feet has been the placement position since 1982 or 1983, and golfers have continually played up to the out-of-bounds markers on private lots.

4

Golf course superintendent Tim Rowe testified that he and his staff are responsible for maintenance of the CGCC golf course, and he has played golf on the course since 1982. He stated that the in-play area is marked by the out-of-bounds markers, and the play area is maintained by the golf course. In particular, Mr. Rowe said that all three lots owned by Mr. Williams have in-play areas. Lots 16 and 18 have grass for the full in-play width of 35 feet; while on lot 14, the grassy portion is 15 feet and the remainder of the in-play area is wild and undeveloped. The wild portion of lot 14 is not maintained, but occasionally is mowed for brush control and receives some water and fertilizer. He said that after 2010, mowing Mr. Williams's lots had been modified to minimize risk to the grounds crew until the legal matter can be resolved.

Mark Beardslee, a real estate agent who sold Mr. Williams one of the lots, filed a declaration concerning his interactions with Mr. Williams. He recalled that he and Mr. Williams walked out to one of the lots and looked at the out-of-bounds markers. The agent believed that Mr. Williams understood that golf play was allowed up to the out-of-bounds markers on the lot. It was clear from the lot that the golf course watered, fertilized, and mowed to the out-of-bounds markers along the course. Also, the natural appearance of the lot beyond the markers showed that Mr. Williams's predecessor had not maintained the portion of the lot beyond the markers.

5

Mr. Williams responded with his own declaration as well as declarations from others. Robert Hibbard, a prior CGCC maintenance employee for 11 years, testified that on hole number 2 of the old nine, there were no markers on the course near Mr. Williams's house prior to 2010. He said the closest out-of-bounds marker was 50 to 60 yards away, located in bushes between Mr. Williams's house and the number 2 tee. He also testified that quite often, he would notice the old 2" x 4" aged, white markers laying on the ground. When he attempted to pound the markers back into the ground, they would split at the top. He also testified that he saw golfers using a rock to pound the markers back into the ground. Additionally, Mr. Hibbard said that property line adjustments were made to the markers for property owners on holes 1 and 2 of the old nine. He said the markers were close to the houses, so adjustments were made by moving the markers on the left hand side of the fairway to the property line and adjusting the right hand side to accommodate the left side relocation.

Robert Oien worked as an irrigation specialist for CGCC for 10 years beginning in 2001. Mr. Oien stated that in the fall of 2008, he was asked by Superintendent Rowe to reestablish the aging and indistinct boundaries on the old nine. He said that he and another employee did their best to identify the correct out-of-bounds lines based on the remnants of old wooden 2" x4" white-painted stakes that were often rotten or completely

6

missing. At the time, there appeared to be no stakes on Mr. Williams's lot. Mr. Williams asked Mr. Oien not to place the markers in his yard, and he did not. Mr. Oien also remembered that while he was placing markers on hole number 1, he discovered that a property owner surveyed his or her lot and that the survey stakes were farther out on the fairway than where Mr. Oien thought the established line was located. After consulting with their supervisor, the out-of-bounds markers were moved toward the fairway because of the new survey markers.

Mr. Oien said that the grounds crew would water, mow, and fertilize up to the out-of-bounds markers unless a homeowner complained. Mr. Hibbard remembered one woman complaining in 2007, and the crew stopped mowing that portion of her property. When the out-of-bounds markers were moved in 2008 on some properties, the crew stopped maintaining the areas outside the markers.

A different real estate broker, Steve Crisp, testified that he was the first to sell property to Mr. Williams in 2003. Again in 2005, he discussed the purchase of another lot with Mr. Williams, lot 16, and reviewed plans to build his new house. Mr. Crisp stated that on the first visit to the lot, he observed an unplayable area with very thick, impassable woods and underbrush. He said that it was quite apparent that no maintenance had ever occurred on the lot. Mr. Crisp did not observe any out-of-bounds

markers on the property. He said the property first became playable when Mr. Williams removed the thickets on the golf course side of the home.

Mr. Williams said in his declaration that until 2010, he had no knowledge that CGCC was claiming a 35-foot easement across his property. When he purchased his lots between 2003 and 2005, there were no out-of-bounds markers on any of these properties. Two of the lots were undeveloped and not used for golf play. The lot he built his home on only became playable once he landscaped his property. In 2008, CGCC installed markers on properties adjacent to his lots. Mr. Williams stated that after the dispute with CGCC started, golfers claimed a right to hit balls out of his yard, causing damage to the lawn. One of his lots remains overgrown and is not used for golf play.

The trial court granted summary judgment in favor of CGCC based upon theories of express easement, equitable servitude, and prescriptive easement. The summary judgment order awarded CGCC a 35-foot easement for golf play and maintenance across Mr. Williams's three lots. The order also prohibited Mr. Williams from interfering with persons engaged in golf play on his lots, not to maintain his landscaping as to constitute a barrier to golf play or course maintenance within the golf play area, and not to move or handle golf balls that are in the golf play area.

Mr. Williams moved for summary judgment on CGCC's claims of money past due on his CGCC account. He contended that CGCC did not have legal authority within the protective covenants to charge property owners assessments or collect a money judgment on the property owners. Mr. Williams cited paragraph 12 of the covenants. That paragraph merely requires membership in the CGCC prior to ownership of a lot in the subdivision. Mr. Williams also produced a letter from a CGCC president acknowledging that CGCC had no legal authority under the covenants to monetarily assess property owners in Mr. Williams's section of the subdivision. The trial court granted Mr. Williams's motion.

Both Mr. Williams and CGCC appeal the trial court's summary judgment decisions against them. Mr. Williams contends that the trial court erroneously viewed evidence in favor of CGCC, and a genuine issue of material fact exists as to whether CGCC has a right to use his property. CGCC contends that the trial court failed to consider various documents to interpret the intent of the covenants, and this documentation raises a genuine issue of material fact as to whether CGCC intended to assess memberships in paragraph 12 as a funding mechanism for the benefit of the golf course and property owners.

ANALYSIS

Summary judgment orders are reviewed de novo on appeal. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). Summary judgment is appropriately granted if the evidence presented shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). One who moves for summary judgment has the initial burden of showing the absence of an issue of material fact, irrespective of which party, at the time of trial, will have the burden of proof on the issue concerned. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). Any doubt as to the existence of a genuine issue of material fact will be resolved against the movant. *Id.* at 226. A material fact is one upon which the outcome of the case depends, in whole or in part. *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993).

"A party may move for summary judgment by setting out its own version of the facts or by alleging that the nonmoving party failed to present sufficient evidence to support its case." *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 350, 144 P.3d 276 (2006). "Once the moving party has met its burden, the burden shifts to the nonmoving party to present admissible evidence demonstrating the existence of a genuine

issue of material fact." *Id.* at 351. "If the nonmoving party cannot meet that burden, summary judgment is appropriate." *Id.*

*Express Easement.* Mr. Williams contends that summary judgment was not appropriate because, as a matter of law, the covenants do not establish a right for CGCC to use his property. "'An *easement* is a right, distinct from ownership, to use in some way the land of another, without compensation', whereas a *restrictive covenant* limits the manner in which one may use his or her own land." *City of Olympia v. Palzer,* 107 Wn.2d 225, 229, 728 P.2d 135 (1986) (quoting *Kutschinski v. Thompson,* 101 N.J. 649, 656, 138 A. 569 (1927)). Easements may be created by agreements or covenants. *Kalinowski v. Jacobowski,* 52 Wash. 359, 367, 100 P. 852 (1909).

> A court's first objective in interpreting a restrictive covenant is ascertaining the intent of the original parties.
> [W]here construction of restrictive covenants is necessitated by a dispute not involving the maker of the covenants, but rather among homeowners in a subdivision governed by the restrictive covenants, rules of strict construction against the grantor or in favor of the free use of land are inapplicable. This is because [s]ubdivision covenants tend to enhance, not inhibit, the efficient use of land.
> As such, [t]he court's goal is to ascertain and give effect to those purposes intended by the covenants. In ascertaining this intent, we give a covenant's language its ordinary and common use and will not read a covenant so as to defeat its plain and obvious meaning. Moreover, [t]he court will place special emphasis on arriving at an interpretation that protects the homeowners' collective interests.

11

*Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 120, 118 P.3d 322 (2005) (citations and internal quotation marks omitted). As evidenced by *Viking Properties*, the above rule has been extended to disputes between a homeowner's association and a property owner. Because this case similarly involves a dispute between a homeowner's association and a property owner, the above rule applies in the context of this dispute. We, therefore, must give the covenant's language its plain and ordinary meaning, and place special emphasis on arriving at an interpretation that best protects CGCC's collective interests.

Paragraph 6 of the covenants is unambiguous. The plain and ordinary meaning of that covenant merely restricts the type of landscaping that a lot owner may place in certain marked areas of his or her lot. There are two reasons why the language does not create an easement. First and foremost, there is no language in paragraph 6 that *creates* an easement. Second, the language in paragraph 10 of the covenants explicitly creates easements for drainage, utilities, walkways, golf cart use, and access roads. Because CGCC chose not to use similar language in paragraph 6, this confirms CGCC's intent not to create an easement in that paragraph. We conclude as a matter of law that paragraph 6 does not create an easement in favor of CGCC.

*Equitable Servitude.* "There is a wide difference between actual legal ownership of an interest or easement in the real estate of another, and the right, because of equitable principles, to demand that property of that other shall be used only in a certain manner. The one right is based on partial legal title, while the other is based on conduct, representations and acts which in justice, between man and man, may not be repudiated." *Johnson v. Mt. Baker Park Presbyterian Church*, 113 Wash. 458, 466, 194 P. 536 (1920).

In *Johnson*, the Washington Supreme Court invoked equitable principles to impose restrictive covenants on a property owner when the owner had knowledge of the restrictions applicable to the neighborhood but not expressed on the property deed. *Id.* at 465-66. There, a neighbor sought to enjoin the construction of a church on a parcel in the neighborhood. *Id.* at 459. The neighborhood lots when initially sold contained restriction clauses that prohibited any building except for residences. *Id.* All persons buying lots were told of the restriction and that the restriction was reflected in property deeds. *Id.* However, when the church purchased the property, no such restriction was in place. *Id.* at 459-60. The church argued that it was not bound by the same restrictive covenants as the other property owners because the statute of frauds required all use restrictions on real property to be in writing. *Id.* at 462. While the court agreed that the statute of frauds required a written covenant encumbering the land, it also concluded that a remedy based

13

on equitable principles did not require such a writing. In enforcing the neighborhood restrictions on the church, the court stated,

> Equity originally arose out of the fact that the law was unable to give relief in many instances where fair dealing and good conscience demanded that relief should be given, and so equity here will say to the appellant that, having bought its property with full knowledge of the rights and privileges of others, it may not now claim the right to use the property in any way it may see fit.
>
> . . . .
>
> The remedy, in cases such as the above mentioned, must be based on equitable principles, because it cannot be said that the one party has an interest or easement in the property of the other created by any written instrument; and if relief should be granted under those circumstances, we can see no reason why similar relief should not be granted under the showing here.

*Id.* at 466.

CGCC contends that paragraph 6, combined with markers and historic use, provide Mr. Williams with "full knowledge of the rights and privileges of others." However, Mr. Williams and his witnesses' declarations contest such clear notice, and we have held that paragraph 6 does not create an express easement as a matter of law. The question of clear notice to Mr. Williams is especially problematic for CGCC to the extent that CGCC did not maintain a 35-foot, in-play areas on *all* of the old nine lots, and that such in-play areas did *not* include the subject lots prior to their respective purchase by Mr. Williams. Because genuine issues of material fact exist concerning clear notice to Mr. Williams, the

14

trial court erred in granting summary judgment to CGCC on its claim of equitable servitude.

*Prescriptive Easement.* To establish a prescriptive easement, the party asserting the easement has the burden of proving (1) use of the land that is adverse to the owner of the servient estate; (2) use that is open, notorious, continuous, and uninterrupted for a period of 10 years; and (3) an owner's actual or constructive knowledge of such use at a time when the owner was able to assert and enforce ownership rights. *810 Props. v. Jump*, 141 Wn. App. 688, 700, 170 P.3d 1209 (2007); *see also* 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW, § 2.7 at 101 (2nd ed. 2004) (An owner's actual knowledge may be presumed where the use is sufficiently open and notorious.). The record shows that there are issues of material fact concerning whether, and to what extent, CGCC continuously used one or more of Mr. Williams's three lots for the 10-year prescriptive period. This issue clearly is contested, and summary judgment was improper.

*Cross Appeal.* In a cross appeal, CGCC contends that Mr. Williams owes money past due on his membership account. Restrictive covenant 12 states, "Membership in the Chewelah Golf & Country Club Association shall be required prior to ownership of any

15

lot in the Chewelah Golf & Country Club Subdivision." CP at 23. The covenants do not provide for assessment of dues or other homeowner fees after purchase of the home.

The bylaws in effect when Mr. Williams purchased his property in 2003 are silent as to CGCC's ability to assess its members. CGCC amended the bylaws in 2007 to authorize CGCC to assess members an amount up to the cost of a single person's season pass, provided that the person has not purchased a season pass. The 2007 bylaws also state that all unpaid dues assessment shall constitute a lien against the membership and that if dues are not paid in three years, *the result is a revocation of membership.* The bylaws are silent to any other remedy for nonpayment of dues.

CGCC contends that this provision was intended as a funding mechanism to pay for operation of the golf course and should be interpreted as such. Mr. Williams contends that the covenant cannot be enforced because it does not touch and concern the land. Even if it did, Mr. Williams asserts CGCC does not have the authority to collect for nonpayment of membership dues because the covenants are silent as to any requirement to maintain a membership in CGCC or to pay any assessments to CGCC.

We conclude that paragraph 12 runs with the land. "For covenants to pay money, the critical issue is the 'touch and concern' requirement." *Lake Arrowhead Cmty. Club, Inc. v. Looney*, 112 Wn.2d 288, 295, 770 P.2d 1046 (1989). To touch and concern the

16

land, a covenant must be related to the land so as "to enhance [the land's] value and confer a benefit upon it." *Rodruck v. Sand Point Maint. Comm'n*, 48 Wn.2d 565, 575, 295 P.2d 714 (1956). Requiring initial membership enhances Mr. Williams's property by providing funds to maintain the subdivision and allow participation in golf course activities attached to the land. Additionally, the document reserving the covenants expressly states that the covenants run with the land.

Even interpreting the covenants in a manner consistent with the best interests of CGCC, we conclude that paragraph 12 (in isolation or in conjunction with other covenants) does not provide CGCC the authority to collect for nonpayment of dues. The covenant states only that membership is required before purchase. The bylaws in effect at the time of purchase do not provide for assessment of homeowners. The 2007 amendment to the bylaws expressly limits the remedy for nonpayment to revocation of membership; it does not authorize collection for nonpayment. The trial court properly granted summary judgment in favor of Mr. Williams on CGCC's second claim.

In conclusion, we hold that covenant 6, as a matter of law, does not create an express easement, and that issues of material fact preclude summary judgment on CGCC's claims of equitable servitude and prescriptive easement. We do, however,

17

affirm the trial court's grant of summary judgment in favor of Mr. Williams and hold that CGCC cannot collect unpaid membership dues.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Brown, A.C.J.

_____
Fearing, J.